518 F.2d 543
 10 Fair Empl.Prac.Cas. 1057,
9 Empl. Prac. Dec. P 10,199
Hyland Lewis BARNETT, Appellant,
v.
W. T. GRANT COMPANY, a corporation, et al., Appellees.
Hyland Lewis BARNETT, Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, an unincorporated
labor organization, Appellant.
 Nos. 74-1638, 74-1639.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1975.
Decided June 12, 1975.
 
 Jonathan Wallas, Charlotte, N. C. (Robert Belton, J. LeVonne Chambers, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., Jack Greenberg and Morris J. Baller, New York City, on brief), for appellant in No. 74-1638 and for appellee in No. 74-1639.
 Francis M. Fletcher, Jr., Charlotte, N. C. (Harkey, Faggart, Coira & Fletcher, Charlotte, N. C., on brief), for appellee, Local 71, in No. 74-1638.
 James J. Baldwin, Greenville, S. C. (James B. Spears, Jr., and Haynsworth, Baldwin & Miles, Greenville, S. C., on brief), for appellee, W. T. Grant Co., in No. 74-1638.
 Sidney Dickstein, George Kaufmann, Ira R. Mitzner and Dickstein, Shapiro & Morion, Washington, D. C., on brief for appellee, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, in Nos. 74-1638 and 74-1639.
 Before WINTER, CRAVEN and BUTZNER, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 
 1
 Hyland Lewis Barnett brought this suit under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-5(f), and 42 U.S.C. § 1981 seeking redress for alleged racially discriminatory practices by defendants. After a trial the district court denied relief on Barnett's individual claim, and held that the class action numerosity requirement was not met with respect to the only class that Barnett could appropriately represent, which was a much narrower class than Barnett had sought to represent. We affirm the district court as to Barnett's individual claim, but reverse his narrowing of the class action and hold both that Barnett can represent the broader class and that that class is entitled to relief.
 
 I.
 
 2
 W. T. Grant Company is a Delaware corporation with a large retail marketing enterprise in Charlotte, North Carolina. Its operations in Charlotte (the subject of this suit) are divided into two departments: the Fleet Operation, a relatively small longline trucking operation that supports its basic marketing business; and the Consolidation Operation, which includes its warehouse facilities.
 
 
 3
 Barnett began work with Grant in the summer of 1970 as a warehouseman and occasional clerk in the Consolidation Operation. In the fall he became a switcher, moving and parking trailers at the Grant facilities and driving trailers to other trucking terminals in the Charlotte area. But his real desire was to be an over-the-road driver in charge of tractor-trailer rigs making long hauls on the open highway. Grant employed at the time 27 such drivers, all of them white. Barnett's individual charge of discrimination is that he was denied the company's normal 60-day probationary period for fledgling over-the-road drivers because he was black. The record, however, amply supports the district court's finding that instead of suffering invidious discrimination Barnett may actually have received preferential treatment.
 
 
 4
 In early 1972, when Barnett first expressed his interest to Grant's fleet manager, Barnett was only 21 years old and had had no over-the-road training or experience. Thus he did not meet Grant's specific criteria that over-the-road drivers be at least 23 years old and have two years' driving experience.[1] These requirements, which Grant had never waived, are reasonable ones for the responsible position of over-the-road driver. Nor have they been shown to exclude a disproportionate number of black applicants.[2]
 
 
 5
 In addition to his failure to meet these objective criteria, Barnett had had two accidents within the previous year while performing his switching duties, including one that occurred when he was by his own admission "angry and upset" at a fellow employee. Moreover, Barnett had once been allowed to try his hand at open highway driving by an experienced driver with whom he was riding, but had quickly pulled over and stopped driving because he was admittedly upset and nervous and was "making a lot of mistakes."
 
 
 6
 Despite all of this, the fleet manager agreed to allow Barnett to make a "test run" with a driver of Barnett's own choosing, and to put Barnett on probationary status if that driver's report was favorable.[3] Barnett took the test run with a man named Davis because he considered him a fair man who would report honestly. Davis' report was unfavorable. The fleet manager subsequently denied Barnett probationary status based on Davis' report, Barnett's failure to meet the age and experience requirements, and Barnett's "immature attitude" as shown by the switching yard accident apparently caused by anger.
 
 
 7
 On this state of facts the district judge found "that the refusal of the defendant to transfer Barnett and promote him to the job of probationary road driver was not based upon racial grounds, but was based upon a reasonable business decision and judgment as to his lack of maturity, lack of experience, tender age, and not yet stable emotional outlook." Even though we believe, unlike the district court, that an inference of racial discrimination should be drawn from Grant's all-white over-the-road driver complement, the facts rebut the inference in Barnett's case and plainly show that he simply came up short when offered a special opportunity.
 
 IIA.
 
 8
 Although Barnett's original complaint alleged only an individual cause of action, the district court permitted him to amend it to include a class action on behalf of "all black persons who have been or who may be affected by the unlawful employment practices complained of herein." The district court entered a conditional order allowing the case to proceed to trial as a class action on behalf of "all blacks presently employed at the Mecklenburg County, North Carolina facilities of the defendant W. T. Grant Company as well as all blacks who have been, continue to be, or might be adversely affected by the alleged racially discriminatory employment practices of the defendants."In its decision on the merits, however, the district court held that Barnett could represent only "that group of black persons who have unsuccessfully applied for or requested road driving jobs with the Company." The court found that this much narrower class consisted of less than five persons and therefore failed to meet the numerosity requirements of Rule 23(a), so that Barnett's class action failed entirely.
 
 
 9
 Unless abuse is shown, the decision of a district court on whether the numerosity of a class makes joinder impracticable is final. Cypress v. Newport News General & Nonsect. Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967); 3B J. Moore, Federal Practice P 23.05, at 23-280 (2d ed. 1974). The court below was certainly within its discretion in deciding that a class action was unnecessary when only those few blacks who had unsuccessfully applied for driver positions were considered. We believe, however, that the district court erred when it narrowed the class from that described in its pre-trial order.
 
 
 10
 Barnett in his complaint and at trial attacked various discriminatory employment practices of defendants, and sought to represent two specific groups of persons, in addition to black driver applicants, who had been or would be adversely affected by them. One group of practices included the maintenance of separate hiring locations for Fleet Operation and Consolidation Operation workers, recruitment of new over-the-road drivers only from walk-in applicants or by "word of mouth" from present drivers, periodic display of a sign at the hiring facilities of the Fleet Operation stating that no applications were being taken, and the absence of carry-over seniority for anyone who might transfer from the Consolidation Operation to the Fleet Operation to take a job as driver. Barnett sought to represent all those blacks who had been kept ignorant of driver positions or discouraged from applying for them due to these practices. In addition, he sought to represent those black employees of Grant who had been or in the future would be denied promotion to supervisory positions because of the company's nonobjective selection standards for supervisors.
 
 
 11
 The district court did not explain its reasons for disallowing Barnett's representation of these two groups of blacks. Whatever its reasoning, we believe the court construed too narrowly the proper scope of class actions in employment discrimination cases.
 
 
 12
 Barnett brought his class action under subsection (b)(2) of Rule 23, which states that a class action is maintainable when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The Committee Notes to Rule 23(b)(2) indicate that it was intended as a vehicle for civil rights attacks on unlawful discrimination against a class whose members might be incapable of specific enumeration. See 3B J. Moore, Federal Practice P 23.01(10.-2) (2d ed. 1974). Viewed broadly, Barnett's suit is an "across the board" attack on all discriminatory actions by defendants on the ground of race, and when so viewed it fits comfortably within the requirements of Rule 23(b)(2). See Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1124 (5th Cir. 1969).[4] We believe such a characterization is more consonant with the broad remedial purposes of Title VII itself, and that the district court's less charitable view, under which Barnett could as a class representative challenge only those specific actions taken by the defendants toward him, would undercut those purposes.
 
 
 13
 The Fifth Circuit has recently reiterated its similar approach to class actions in employment discrimination cases. In Long v. Sapp, 502 F.2d 34 (5th Cir. 1974), the individual plaintiff challenged her discharge from employment as racially motivated. In her class action, however, she sought to represent not only all black persons discharged by defendant, but also "all black persons who have applied for employment with the defendant or who would have applied for employment had the defendants not practiced racial discrimination in employment and recruiting." The district court dismissed the second portion of the class action on the ground that the plaintiff as a discharged employee was not a member of the named class. The Fifth Circuit reversed, stating:
 
 
 14
 (Plaintiff) directs her claims at racially discriminatory policies that she alleges pervade all aspects of the employment practices of (defendant). Having shown herself to be black and a former employee, . . . she occupies the position of one she says is suffering from the alleged discrimination. She has demonstrated the necessary nexus with the proposed class for membership therein. As a person aggrieved, she can represent other victims of the same policies, whether or not all have experienced discrimination in the same way.
 
 
 15
 Id. at 43.
 
 
 16
 Like the plaintiff in Long, Barnett directed his attack at discriminatory policies of defendants manifested in various actions, and as one who has allegedly been aggrieved by some of those actions he has demonstrated a sufficient nexus to enable him to represent others who have suffered from different actions motivated by the same policies.[5] See also Reed v. Arlington Hotel Co., 476 F.2d 721, 722-23 (8th Cir.), cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 425 (8th Cir. 1970); Johnson, supra. We see no way in which his interests could be antagonistic to those of anyone in the class, and thus no basis for fear that he might be an inadequate representative under Rule 23(a) (4). See Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975). But cf. EEOC v. Detroit Edison Co., 515 F.2d 301 (6th Cir. 1975).
 
 IIB.
 
 17
 The district court found that of 17 nonsupervisory job classifications in Grant's Fleet and Consolidation operations, including that of over-the-road driver, blacks were at the time of this suit employed in only one, that of warehouseman. There were no black supervisors. Grant's 18 black warehousemen represented 19 percent of its total nonsupervisory work force of 95 persons. The court found that the adult population in the Charlotte area was approximately 25 percent black.
 
 
 18
 Although the court from this data found that "black persons were not employed at any time pertinent to the case in proportion commensurate with the numbers of black drivers or black employees in the community at large," and although it recognized that "the statistical data may well support an inference that Grant had a policy of discriminating against black employees," it failed to find Grant guilty of discrimination. It appears that the court hesitated because it found "no evidence, other than the statistical data, to demonstrate intentional discrimination," and "no evidence of individuals in the would-be class who have been discriminated against on account of race." But as Chief Judge Brown has said, "(i)n the problem of racial discrimination, statistics often tell much, and Courts listen." Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), aff'd 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962) (per curiam).
 
 
 19
 The district court erred in requiring proof of actual discrimination in addition to the statistical data implying discrimination. Statistics can in appropriate cases establish a prima facie case of discrimination, without the necessity of showing specific instances of overt discrimination. Long, supra, at 40-41; United States v. Chesapeake & O. Ry., 471 F.2d 582, 586 & n. 7 (4th Cir. 1972), cert. denied, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973), and cases there cited; Note, Employment Discrimination: Statistics and Preferences Under Title VII, 59 Va.L.Rev. 463, 464-66, 472-74 (1973).
 
 
 20
 The statistics here, while not overwhelming, seem to us at the least quite suggestive. The discrepancy between a 25 percent black community and a 19 percent black nonsupervisory work force is significant, especially since all black employees were in one of the 17 job categories. Furthermore, in the job category directly at issue, over-the-road driver, Grant employed no blacks in a force of 27. The total absence of blacks from the supervisory force is also persuasive.[6]
 
 
 21
 In addition to statistics, a court must also examine "patterns, practices and general policies to ascertain whether racial discrimination exists." Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1382 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). Word-of-mouth hiring, which the district court found to be Grant's primary method of recruiting new over-the-road drivers, is discriminatory because of its tendency to perpetuate the all-white composition of a work force. Long,supra, at 41; United States v. Georgia Power Co., 474 F.2d 906, 925-26 (5th Cir. 1973); Rock v. Norfolk & Western Ry., 473 F.2d 1344, 1347 (4th Cir.), cert. denied sub nom., United Transp. Union Lodge 550 v. Rock, 412 U.S. 933, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973). This method appears particularly suspect on this record because it contrasts so sharply with the general advertising and open recruiting policies used by Grant for its Consolidation Operation, which policies resulted in a racially mixed work force compared to the all-white one in Fleet Operation. The separate hiring points for Consolidation and Fleet Operation personnel presented an additional barrier to potential black driver applicants by making it more difficult for blacks responding to the company's Consolidation recruitment even to learn of its Fleet Operation. Similarly, the company's periodic display of a sign stating that no applications were being taken would discourage potential black driver applicants. The collective bargaining agreement in force at the time of suit created a substantial barrier to potential black driver applicants from within the company, for blacks in the Consolidation Operation would likely be unwilling to commit the "seniority suicide" required for a switch to the Fleet Operation.
 
 
 22
 Barnett's statistical challenge to Grant's supervisor promotions is similarly strengthened by evidence of discriminatory practice. The district court found that the company had no objective criteria for the hiring of supervisors. Nonobjective hiring standards are always suspect because of their capacity for masking racial basis. Brown, supra, at 1382-83; Rowe v. General Motors Corp., 457 F.2d 348, 358-59 (5th Cir. 1972). Moreover, the district court found that at least one qualified black employee had been twice passed over for supervisory status in favor of whites, one of whom had less seniority and was brought in from outside the company.
 
 
 23
 These specific practices and policies go far toward explaining the absence of blacks among both Grant's over-the-road drivers and its supervisory personnel, and when combined with Barnett's statistical evidence they establish a strong case of discrimination forbidden by Title VII. We hold that Barnett proved discrimination with respect to potential black driver applicants and with respect to black applicants for supervisory positions.
 
 III.
 
 24
 The district court found evidence that since Barnett instituted this suit defendants had "begun to take more aggressive steps to recruit black employees in the various departments of the enterprise." We presume this includes the over-the-road driver contingent, and we note in this regard that Grant has employed two black drivers during the pendency of this suit. In addition, we are informed that Grant and the Union have negotiated a new agreement providing for carry-over seniority between the Consolidation and Fleet Operations. Based on these changes the district court stated that Barnett's suit "may, therefore, have achieved its essential purpose which in such matters is usually to bring about change rather than exact retribution for past transgressions."
 
 
 25
 We agree with the district court's sentiment, but in equal employment opportunity cases a court cannot abdicate to defendants' good faith its duty of insuring removal of all vestiges of discrimination. This cause will therefore be remanded to the district court with instructions to conduct an immediate inquiry into defendants' current practices with respect to Fleet Operation hiring, seniority carry-over on inter-operations transfers, and recruitment and evaluation of supervisory personnel. Should the court find that any of the disapproved practices survive in any degree, it shall forthwith enjoin their continuation. If the court finds that defendants have completely abandoned the offending practices and replaced them with policies tending to remove their discriminatory effects, we leave it to the district court's considered discretion whether to issue an injunction to insure the continuation of the new policies or instead to retain this case on its docket for a reasonable time and then dismiss it if defendants appear to be pursuing their new policies in total good faith. Cf. Brown, supra, at 1383.
 
 
 26
 Regardless what the district court's inquiry shows, Barnett should recover his costs and reasonable counsel fees. Robinson v. Lorillard Corp.,444 F.2d 791, 804 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Lea v. Cone Mills Corp., 438 F.2d 86, 88 (4th Cir. 1971) (per curiam). These may be taxed against defendant W. T. Grant Company and/or against International Brotherhood of Teamsters and Teamsters Local 71, and may be allocated among the defendants in such proportions as to the district court may seem just and proper. See Great Coastal Express, Inc. v. International Bhd. of Teamsters, 511 F.2d 839, 843-844 (4th Cir. 1975); International Bhd. of Teamsters v. United States, 275 F.2d 610 (4th Cir.), cert. denied, 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960).
 
 
 27
 Affirmed in part; reversed in part; and remanded with instructions.
 
 
 
 [1]
 The United States Department of Transportation imposes certain requirements for an over-the-road truck driver, all of which Barnett met. Department of Transportation regulations specifically provide, however, that an employer may institute additional reasonable requirements such as those of Grant's which Barnett did not meet
 
 
 [2]
 As of the time of trial, only four blacks besides Barnett had ever applied for over-the-road driver positions with Grant, three of them apparently after institution of this suit. Only one had been rejected, and that was because he failed to ICC road test, not because he failed to meet Grant's age and experience requirements
 
 
 [3]
 Barnett argued at trial, and again on appeal, that the fleet manager had agreed to move him directly into probationary status rather than to do so only if he passed the "test run." But the district court found the agreement to be that Barnett had to perform satisfactorily on the test run before he would get the normal 60-day probationary period. That finding is supported by the evidence, and we accept it
 
 
 [4]
 There is some risk in allowing Barnett to attack racially motivated actions from which he has not suffered directly. As Judge Godbold noted in his special concurrence in Johnson v. Georgia Hwy. Express, Inc., 417 F.2d 1122, 1125-27 (5th Cir. 1969), allowing a blunderbuss attack on all discriminatory practices by one who has suffered from only some of them could theoretically foreclose later suit by others who have suffered directly from other of the practices, due to the res judicata effect of class actions. The danger from this theoretical possibility is made more acute by the absence of a requirement of notice to the class in Rule 23(b)(2) actions. But here it is minimal for we interpret Barnett's class action to be only on behalf of those blacks who have applied for over-the-road driver positions, those who have been discouraged from applying or kept ignorant of openings by defendants' practices, and those who have been discriminated against in applications for supervisory positions. Other claims, if any, will not be barred from future adjudication
 
 
 [5]
 The failure of Barnett's individual claim of discrimination does not bar relief for the class he represents. Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1380 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); cf. Huff v. N. Cass Co., 485 F.2d 710 (5th Cir. 1973) (en banc)
 
 
 [6]
 This court has previously found strong evidence of discrimination in statistics that could be characterized as less compelling than those here. In Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1380-82 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972), blacks comprised about 11 percent of hourly rate production employees and about ten percent of the total work force, while the surrounding community was 13 percent black. Blacks were employed in 11 of the 45 job classifications. See also Reed v. Arlington Hotel Co., 476 F.2d 721, 723 (8th Cir.), cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973) (discrimination indicated by statistics showing blacks excluded from only five of 11 departments in hotel)