**Nora LEWIS et al., Plaintiffs,**

v.

**PHILIP MORRIS, INC., et al., Defendants.**

Civ. A. No. 73–0488–R.

United States District Court, E. D. Virginia, Richmond Division.

July 7, 1976.

Henry L. Marsh, III, S. W. Tucker, Hill, Tucker & Marsh, William H. Bass, III, Randall Johnson, Richmond, Va., John W. Scott, Jr., Fredericksburg, Va., Barry Goldstein, New York City, for plaintiffs.

Lewis T. Booker, Hunton, Williams, Gay & Gibson, Thomas J. Manley, Jay J. Levit, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This class action is brought for alleged discrimination against females in employment matters in violation of Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000(e), *et seq.,* for alleged discrimination against blacks in employment matters in violation of both Title VII, *supra,* and the Civil Rights Act of 1866, *as amended,* 42 U.S.C. § 1981, and for an alleged breach of a union's statutory duty to fairly represent all of its members. Section 9(a) of the National Labor Relations Act, *as amended,* 29 U.S.C. § 159(a); *see Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The named plaintiffs, Nora Lewis, Elizabeth Bullock, Mary Carter, Betty Johnson, and Gertrude Moody, are all black female citizens of the United States residing in the City of Richmond, Virginia. They are employed by Philip Morris, Inc., at its facilities in Richmond, Virginia and are members of Local 203 of the Tobacco Workers' International Union.

Defendant Philip Morris, Inc. (hereinafter "Philip Morris" or "Company") is a corporation organized under the laws of the State of Virginia and engaged in the business of manufacturing and marketing consumer goods that travel in interstate and foreign commerce. It has several cigarette manufacturing plants in the City of Richmond, Virginia. Accordingly, the defendant Philip Morris is an employer in an industry affecting commerce within the meaning of § 701(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), and is subject to the provisions of 42 U.S.C. § 1981. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Tillman v. Wheaton-Haven Recreation Ass'n,* 410 U.S. 431, 439–40, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *cf. Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Defendant Local 203 of the Tobacco Workers' International Union (hereinafter "Local 203") is an unincorporated association and a labor union, duly designated and elected as the representative for the purpose of collective bargaining of approximately 5,300 hourly paid employees of Philip Morris in its facilities in Richmond, Virginia. Defendant Tobacco Workers' International Union (hereinafter "International Union") is an unincorporated association and labor union headquartered in Washington, D.C.; Local 203 and a number of other local unions are affiliated with International Union. Accordingly, defendants Local 203 and International Union are both labor organizations engaged in an industry affecting commerce within the meaning of § 701(d) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d) and (e), and are subject to the provisions of 42 U.S.C. § 1981. *See Johnson v. Railway Express Agency, supra; Tillman v. Wheaton-Haven Recreation Ass'n, supra.*

The Court has jurisdiction over the claims raised in the instant action pursuant to 42 U.S.C. § 2000e–5(f), 28 U.S.C. § 1343(4), and 28 U.S.C. § 1337.[1]

---

1. *E. g., Munford v. Glover,* 503 F.2d 878, 883 (5th Cir. 1974); *Retana v. Local 14,* 453 F.2d 1018, 1021–22 (9th Cir. 1972).

The Company's manufacturing operations in Richmond are departmentalized as follows: (1) Warehouse, Shipping and Receiving (hereinafter "WSR"); (2) the Green Leaf Stemmery (hereinafter "Stemmery") —where the then current crop of tobacco is processed for storage; (3) Prefabrication— where tobacco in bulk is processed for cigarette manufacture; and (4) Fabrication— where the cigarettes are manufactured. All the Richmond employees of Philip Morris except the Stemmery employees are employed on a year round basis; the Stemmery employees, with the exception of a small housekeeping staff, are employed seasonally for the period of July to March.

The employees represented by defendant Local 203 include both the seasonal employees of Philip Morris who work at the Stemmery, and the permanent hourly-paid employees who work at the other Company manufacturing locations. Rates of pay, job progression, transfer and seniority of employees, working conditions, and employee benefits are covered by two collective bargaining agreements between the Company and Local 203. One agreement—the "main contract"—covers the permanent employees, and the other—the "supplemental contract"—covers the seasonal employees. The contracts presently in force were negotiated in January 1974, and took effect February 1, 1974 for a three year period to expire on January 31, 1977. The contracts follow the pattern set by prior contracts between the Company and Local 203, commencing with those negotiated in the fall of 1964 which became effective on February 1, 1965.

Named plaintiff Elizabeth Bullock was first employed by the Company in November 1966; plaintiff Gertrude Moody was first employed in October 1966; plaintiffs Nora Lewis, Mary Carter, and Betty Johnson were first employed in December 1968. Each of the named plaintiffs was first employed in the Stemmery, and remained there until April 25, 1972 when they were transferred to the Fabrication Department. Upon their transfer, they acquired transfer date seniority in accordance with the seniority system set forth in the then current 1971 collective bargaining agreement. Each was initially assigned to the entry level "miscellaneous" job classification in the fabrication process, which required them to perform the arduous task of hanging of trays. The hanging of trays requires lifting up to six trays per minute, each weighing up to forty pounds, to a height of over six feet.

By order of October 7, 1974, the Court determined that the action be maintained as a class action pursuant to Rule 23(b)(2) of the Fed.R.Civ.P., see, e. g., Robinson v. Lorillard Corporation, 444 F.2d 791, 802 (4th Cir. 1971), on behalf of a class consisting of the named plaintiffs and all females and black males, whether currently employed or no longer employed for any reason, who were employees of the defendant Philip Morris's Green Leaf Stemmery on or after July 2, 1965. See Patterson, et al. v. The American Tobacco Company, C.A., 535 F.2d 257, at 262 (4th Cir. 1976). The class consists of approximately 3,130 persons. Notice, pursuant to Rule 23(d)(2) of the Fed.R. Civ.P., was given by mail to each of the class members on October 8 and/or 11, 1974, and notices of the pendency of the action were posted at several locations on the premises of Philip Morris.

The plaintiffs initially contended that the Company, with the assent and cooperation of the defendant unions, discriminated against female members of the class on the grounds of their sex and against black members of the class on the grounds of their race, and, additionally, that the defendant Unions failed to press grievances of females or black males with the same diligence as those of white males. More specifically, the complaint alleges that discrimination was perpetrated by: (1) initially assigning females and black employees to seasonal Stemmery jobs in numbers disproportionately large as compared to the initial assignment of white males to Stemmery jobs; (2) paying female Stemmery and black Stemmery employees less than white male Stemmery employees for comparable work; (3) maintaining unlawful seniority and transfer policies which restricted fe-

male Stemmery and black male Stemmery employees from transferring to other plants; (4) promoting and transferring junior white male Stemmery employees over senior Stemmery females; (5) segregating female Stemmery employees into separate "female" jobs; (6) assigning black female employees transferred from Stemmery to the most arduous jobs in the Fabrication Department for disproportionately long periods of time; (7) passing over females and black male employees with greater experience, skill and seniority than white males (i) in the selection of supervisory personnel, and (ii) in providing training for and access to skilled and craft positions; (8) laying off senior females and black males before junior white males in reduction of force; and (9) maintaining disability leave policies which discriminate against maternity leave.

Shortly before trial, however, the parties entered into an agreement for a partial settlement, which provided *inter alia* that trial would be limited to the following issues: (1) whether the members of the class were hired into the Stemmery rather than into permanent employment as a result of racial or sexual discrimination; (2) whether the transfer, promotion, seniority, initial job assignment and wage rate policies discriminated against class members on the basis of race or sex, except in the selection of supervisory and craft personnel; (3) if discrimination in any of the foregoing were found, whether injunctive relief is appropriate and what amount of back pay, if any, should be awarded class members; and (4) what costs, expenses and attorney fees should be awarded. All claims for affirmative relief sought on the basis of alleged discriminatory working or disciplinary conditions were withdrawn. The maternity leave issue was expressly reserved. The partial settlement agreement was approved by the Court on June 6, 1975 after appropriate notice of the agreement was given all members of the class, pursuant to the provisions of Rule 23(e) of the Fed.R.Civ.P.

On or about March 16, 1970, the named plaintiffs Mary Carter, Elizabeth Bullock, and Gertrude Moody, along with thirty-six other black female employees at the Company, filed charges with the Equal Employment Opportunity Commission (hereinafter "EEOC") alleging violations of their rights under Title VII of the Civil Rights Act of 1964. On or about October 20, 1972, named plaintiffs Nora Lewis and Betty Johnson filed similar charges with the EEOC. On that same day, plaintiffs Carter, Bullock and Moody filed additional charges with the EEOC alleging violations of their rights under the Civil Rights Act. The complaints filed with the EEOC, taken together, expressly list all the defendants as offending parties. In letters dated July 25, 1973, the EEOC advised all of the named plaintiffs of their right to institute an action in federal court. In letters dated August 21, 1973, the EEOC advised plaintiffs Mary Carter, Elizabeth Bullock, and Gertrude Moody of their right to sue on their amended charges. The instant action was filed on September 9, 1973 within the 90-day period specified in 42 U.S.C. § 2000e–5(f).

The defendant International Union contends that it was not served with notice of the EEOC charges, nor approached by the EEOC in conciliation negotiation, and argues, therefore, that it should be dismissed as a party defendant. The United States Court of Appeals for the Fourth Circuit has held, however, that the Commission's failure to attempt conciliation or serve notice on defendants of filed charges is not a jurisdictional bar to an employee's action if the employee has properly filed his complaint. An employee cannot be charged with the Commission's failure to execute its statutory duties. *Russell v. American Tobacco Company*, 528 F.2d 357 at 365 (4th Cir. 1975). Accordingly, the Court concludes that International Union is properly before it as a party defendant.

Before turning to the factual findings, the Company's contention that this Court's previous decision of *Quarles v. Philip Morris, Inc.*, 279 F.Supp. 505 (E.D.Va.1968), is dispositive of the race discrimination claims asserted in the instant action on the grounds of *res judicata*, collateral estoppel,

or *stare decisis*, must be addressed. In *Quarles*, a black employee of Philip Morris brought a class action against the Company, Local 203 and the Local's President on behalf of *all* blacks employed therein alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964. The Court held *inter alia* that "The company has not engaged in discriminatory hiring practices since January 1, 1966, and consequently, the plaintiffs are not entitled to relief on this issue." It also held that Stemmery employees were not discriminated against by the advancement, transfer, and seniority policies of the Company.

> In fashioning a remedy the court must first determine the class of employees to which it is applicable. . . .

> Employees of the stemmery are not included in the class. They are seasonal employees hired on a temporary basis only. They do not attain permanent employment seniority unless they are hired as regular employees in another department. The company's experience with the generally poor quality of labor available on a seasonal basis provides a rational classification that distinguishes seasonal employees from permanent employees. 279 F.Supp. at 519.

If the decision is deemed to be controlling over the instant controversy, it would bar those members of the class who were members of the *Quarles* class from relief on the grounds of *res judicata*, and it would serve as a strong precedent against those members of the present class not parties of the class in *Quarles* on the grounds of *stare decisis*—unless the plaintiffs can show a significant change in the factual circumstances from those of the *Quarles* case, that decision would control. However, the Court concludes on the basis of either of two rationale that *Quarles* does not so control, for the class in *Quarles* did not adequately represent the claims of the class in the instant case.

Although the class in *Quarles* did include Stemmery employees, indeed the named plaintiffs in that case were former Stemmery employees who had transferred to the Prefabrication Department, the claims of the Stemmery employees were seemingly lost in the breadth and ambition of the class's overall interest. *Quarles*, which was one of the early resolutions of a Title VII controversy, reflects in its opinion and documents contained in the case file that the plaintiffs therein were, in part, seeking to secure equal benefits for what readily appeared to be a deserving class—the black *permanent* employees of the Company. For example, in the Court's findings that the Company had not engaged in discriminatory hiring practices after January 1, 1966, the Court based its conclusion on the fact that the percentage of blacks in Fabrication and WSR had been substantially increased. It also noted, with less emphasis, that the percentage of blacks in the Stemmery and Prefabrication, "while still large," had been reduced. The Court's findings that blacks were not discriminated against in payment scales was based on a consideration of the rates of comparable jobs in the permanent departments, even though jobs existed in the seasonal departments that could be compared to similar jobs in the permanent departments. Additionally, the Court summarily excluded the Stemmery employees from any consideration of promotion or transfer discrimination, while granting relief to blacks in one of the Company's permanent departments. The *Quarles* opinion, authored by now United States Circuit Judge John D. Butzner, was and is one of the monumental decisions in the area of Title VII law for its astute realization that practices that are currently neutral may, in effect, perpetuate past discriminatory practices. It suffers, however, from the plaintiffs' attempt to include a broad class of litigants and yet prepare and advocate with force the claims of some class members to the detriment of a distinct and aggrieved alternate portion of the class.

As Mr. Justice Harlan observed: "The judgment in a class action will bind only those members of the class whose interests have been adequately represented by existing parties to the litigation." *Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 691, 81 S.Ct. 1309, 1314, 6 L.Ed.2d

604 (1961). *See Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975); *Gonzales v. Cassidy*, 474 F.2d 67, 74–75 (5th Cir. 1973); M. Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39 (1967). *See also Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). The generally accepted standard to be employed for determining whether the class was adequately represented in *Quarles* is whether the class representatives, through their counsel, vigorously and tenaciously protected the interests of the entire class. *See Gonzales v. Cassidy, supra.* Viewing the entire *Quarles* record and the Court's finding in that case, the Court now concludes that the interests of the seasonal employees of Philip Morris were not satisfactorily advanced and litigated.

The situation of the seasonal employees was exacerbated by the failure to notify the members of the class of the pendency of the litigation. Although Rule 23 does not mandate notice for (b)(2) actions such as the instant one, the Federal Rules of Civil Procedure must give way to constitutional imperatives. In the typical (b)(2) class action, notice would not appear to be necessary; the class is typically homogeneous without major conflicting interests between members, and often it is small in number. In most (b)(2) cases, "[n]otice would add little or nothing." 3B J. Moore, *Federal Practice* ¶ 23.07[1] (2d ed. 1974) at 1152. However, most racial and/or sexual discrimination cases simply do not fit this stereotype. They are large and often encompass a varied set of subclasses—this case, for example, includes both blacks and females. Indeed recent Fourth Circuit decisions indicate that it should be the policy of the federal courts to be receptive to large classes in discrimination suits so as to effectively finalize the controversy with respect to the defendants and to, by economics of scale, reduce the plaintiffs' and defendants' trial costs. *See Barnett v. W. T. Grant Co.*, 518 F.2d 543, 548 (4th Cir. 1975). *See also Long v. Sapp*, 502 F.2d 34, 43 (5th Cir. 1974); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970); *Rich v. Martin Marietta Corp.*, 522 F.2d 333,

341 (10th Cir. 1975). Binding all class litigants to a judgment when they have had no notice to the action served on them, runs a substantial risk that class members may in fact be prejudiced without being heard or without having the opportunity to assess, for themselves, the adequacy of their purported representatives. As was noted by Mr. Justice Jackson in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest."

The counter arguments, (1) that the district judge can accurately assess the representativeness of the named plaintiffs and (2) that aggrieved class members can collaterally attack the judgment, assume much in an area of constitutional significance that typically will tolerate few assumptions. The first argument assumes that the district judge can foresee *all* the potential claims that *may* be raised by class members in contesting the adequacy of the class representatives and resolve them, perhaps without specifically pointed argument, in a favorable manner. This burden becomes more weighty as the class size and diversity of class membership increase. The second argument is a smoke screen for justifying the blatant realization that some litigants have not been or may not be afforded due process under the procedures followed in the first case. It is, of course, far better to utilize appropriate procedures at the first trial, then to throw the burden upon the litigants who, *in the face of a seemingly valid judgment directly on the matter in controversy*, must attempt to regroup as a subclass and argue, after-the-fact, that they were not adequately represented. Furthermore, allowing or encouraging liberal collateral attacks on (b)(2) class actions, defeats one of the prominent purposes of class certification—that of achieving a finality of claims with respect to the defendants. Again, the potential and the need for collateral attacks on the first judgment is aug-

mented as the class size and diversity of its membership increases. There is a point at which judicial paternalism is simply inoperable, and the class members must be given the ability and the opportunity to assess the adequacy of their representatives themselves by being served with a proper notification of the proceeding and their options therein. That point was surpassed in the *Quarles* case. *See Schrader v. Selective Service System Local Board No. 76*, 470 F.2d 73 (7th Cir. 1972); *Zeilstra v. Tarr*, 466 F.2d 111 (6th Cir. 1972); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564–65 (2d Cir. 1968) (dicta), *rev'd on other grounds, Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1968); *Hoston v. United States Gypsum Co.*, 67 F.R.D. 650 (E.D.La.1975); *Newman v. Avco Corp.*, 380 F.Supp. 1282 (M.D.Tenn.1974); *McCarthy v. Director of Selective Service System*, 322 F.Supp. 1032 (E.D.Wis.1970), *aff'd per curiam on other grounds*, 460 F.2d 1089 (7th Cir. 1972). *But see Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975); *Gonzales v. Cassidy, supra.* In *Quarles* the class was large and subsumed several distinct subclasses; the danger of failing to adequately consider the plight of one or more of these subclasses was readily apparent. Under the circumstances, an order directing that all class members be notified of the action so they could champion their own interests should have been requested and entered. The failure to so do requires the Court to now hold, consistent with the constitutional demands of the due process clause of the Fourteenth Amendment, that the class members of the instant suit—the Stemmery employees—were not parties in any meaningful sense to the *Quarles* action and, therefore, are not bound by its decree under the principles of *res judicata.* Nor are they bound by the principles of *stare decisis*, for the issues pertinent in this action were not fully and fairly resolved in the previous one.

█ Recent case law indicates that a prima facie case of discrimination may be demonstrated by statistical evidence that blacks and/or females receive disparate treatment from that afforded whites and/or males at the hands of the defendants, *e. g., Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975), and that burden shifts to the defendants to come forward with evidence to rebut the plaintiffs' case. *E. g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *United States v. Chesapeake & Ohio Railway Co.*, 471 F.2d 582 (4th Cir. 1972); *see also United States v. Hayes International Corp.*, 456 F.2d 112, 120 (5th Cir. 1972); *United States v. Ironworkers Local 86*, 443 F.2d 544, 550 (9th Cir. 1971). *Cf. Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

█ The statistics gathered by the plaintiffs and submitted in evidence establish a *prima facie* case of racial and sexual discrimination. Philip Morris assigned over fifty percent of all blacks initially hired from 1965 to 1974 to the seasonal Stemmery jobs, as compared with the assignment of only eleven and five-tenths percent of all whites hired in the same period to the Stemmery. These percentages reveal a disproportionate assignment of newly hired blacks to the Stemmery where the work is temporary and less financially remunerative. As a consequence, during the 1965 to 1974 period, an average of seventy-nine and five-tenths percent of all the hires in the Stemmery were black as compared with an average percentage of blacks in the Richmond work force of about twenty-four percent.[2] The heavy assignment of blacks to

2. The Standard Metropolitan Statistical Area (SMSA) for Richmond as defined by the Bureau of the Census for 1960 included the City of Richmond and the Counties of Chesterfield and Henrico. The 1960 census reports that the civilian labor force was 169,554, of which 42,-942 (25.3%) were blacks and 82,142 (48.4%) were females.

The Standard Metropolitan Statistical Area (SMSA) for Richmond as defined by the Bureau of the Census for 1970 included the City of Richmond and the Counties of Chesterfield, Henrico and Hanover. The 1970 census reports that the civilian labor force over age 16 in the Richmond SMSA was 225,007, of which

the Stemmery has caused it to be a predominately black department; during the 1965 to 1974 period the average percentage of blacks in the Stemmery work force was eighty-four and three-tenths percent. These statistics are particularly significant in light of the Stemmery's history; since its inception in the 1930's and until the early 1960's, the Stemmery operation has been manned almost exclusively by blacks in accordance with a racially defined departmental system.[3] Whites were hired into and employed in the Fabrication operations and the WSR operation, while blacks were hired into the Stemmery and Prefabrication operations. At first glance, the data seems to indicate that the racially defined system is being maintained.

Transfers from the Stemmery were largely limited to openings in the Prefabrication Department until the rules governing the transfers of seasonal employees to permanent employment were changed in the 1974 labor contract to allow seasonal workers to fill entry level vacancies in all areas of permanent employment during periods of Stemmery shutdown. Prefabrication, also historically a black department, continues to be populated largely by blacks. The 1974 contract, however, provides permanent department employees transferring from one permanent department to another with seniority from the date on which they were first permanently hired, while it provides Stemmery employees who transfer with seniority only from the date they first transferred to permanent employment. Accordingly, a Stemmery employee will always be junior in subsequent transfers to an employee hired into one of the permanent departments although both were hired on the same day.

Additionally, the plaintiffs have produced evidence that several company job classifications within each department are predominately "white" or "black", and "male" or "female." In the Stemmery, the female jobs have been in the "light labor" category, and the male jobs have been in the "heavy labor" category. Furthermore, the higher order or "key" jobs have also been sexually stereotyped; there are female tag meter operators, male line-out and press operators, male fork lift operators, and a predominately male skeleton crew that works during the shutdown period at the Stemmery. Individuals transferring from the Stemmery to other departments were also greeted with job stereotyping. The Prefabrication Department also maintained a "light labor" and "heavy labor" classification; in Fabrication the jobs of head-fixer and fixer are male, and the jobs of catcher attendant, examiner, and inspector are female; there has never been a female transfer from the Stemmery to WSR. With respect to the claims of racial discrimination, there have never been any blacks in the highest paying fabrication jobs of "head-fixer", stockroom clerk, or watchman. Several jobs in all of the departments have been totally or predominately filled by one race or sex.

In response to the plaintiffs' claims of hiring discrimination, the defendants have produced evidence indicating that blacks are more willing to accept employment at the seasonal facility, and that Fabrication and WSR, the historically white depart-

52,409 (23.3%) were blacks and 93,937 (41.7%) were females.
On April 27, 1973, the Richmond Standard Metropolitan Statistical Area (SMSA) was revised to include three additional counties, Charles City, Goochland and Powhatan. The 1973 Richmond SMSA included the City of Richmond and the Counties of Chesterfield, Henrico, Hanover, Charles City, Goochland and Powhatan. In 1973, the civilian labor force over age 16 in the Richmond SMSA was 233,068, of which 56,090 (24%) were blacks and 96,775 (42%) were females.

The 1970–73 Virginia Employment Commission estimates of the percent of the total work force which is comprised of blacks and females in the Richmond SMSA is as follows:

Minority (black) 23.6% of the total work force. Female 41.0% of the total work force.

3. So as to comply with executive orders then issued, the Company, on May 1, 1961, established a "Factories Employment Policy" which sought to employ and promote employees without regard to race.

ments, have a substantial proportion of black workers.

Prior to 1971, all of the hiring of hourly employees was done at the 20th Street facility. In 1971, a separate hiring office was opened in the Westab Building on Commerce Road. At Westab, one day a week was assigned exclusively to the hiring of seasonal employees, and the remaining four days assigned to the hiring of permanent employees. Applicants for permanent or seasonal employment applying on an unappropriate day were instructed where and when to reapply. Westab was in turn closed at the end of 1972, and separate hiring officers were established at separate locations for permanent and seasonal hiring. The defendants introduced evidence that of 3,005 applicants for employment who appeared at the seasonal employment office seeking work in the period from 1973 to 1974, only 177, or five and five-tenths percent, were white. Hiring proved to be proportionate to the applicant ratio; out of a total of 992 Stemmery hirees in that period, 50, or five percent were white. Additionally, the defendants demonstrated that the attrition rate among black Stemmery employees has averaged forty-one and one-tenth percent over the last ten years, whereas the white average attrition rate was forty-four and one-tenth percent.[4] In conclusion, the defendants contend that blacks work in the Stemmery because they prefer the work demands there or are willing to work there, while whites are unwilling to accept the work.

The argument has three possible components: First, it may be based on the proposition that of those people that are in fact *qualified only* to perform Stemmery work, only the black portion of the group applies to the plants of Philip Morris for work and is willing to accept Stemmery work. This is another way of saying that blacks that apply to Philip Morris facilities are on the whole less qualified than whites that apply to the same facilities. No evidence was introduced at trial in support of such a proposition and it may be and is rejected out of hand. Second, it may be based on the proposition that, although whites and blacks are hired in appropriate ratios in all the permanent departments, once the decision is advanced to the applicant that a permanent job is not available, (because of racially neutral hiring cycles or a lack of suitable qualifications) whites refuse to work and blacks accept it. Third, it may be based on the proposition that blacks *prefer* to work in the Stemmery, even though given the choice of applying for permanent employment.

The second proposition is potentially supported by inference from the defendants' evidence that the Company's two traditionally white departments now have a substantial population of black workers. As of December 31, 1974, both Fabrication and WSR had a black population that represent a reasonable degree of integration. As compared to the number of blacks in the Richmond work force, approximately twenty-four percent, Fabrication has approximately forty-one percent blacks in its work personnel, and WSR has approximately twenty-eight percent. From January 1, 1965 to December 31, 1974, thirty-two percent of all personnel hired into Fabrication and sixteen percent of all personnel hired into WSR were black. Such data seems to indicate that when positions are available in these two departments, hiring is nondiscriminating. If the third permanent department, Prefabrication, is similar in composition, it would support an inference that all permanent positions are filled nondiscriminately and that blacks are willing to accept the seasonal positions with more frequency than whites. However, two unexplained factors destroy the inference. First, Prefabrication, historically black, con-

---

4. The attrition rate is measured by the ratio between the number whose employment with the Company terminated during a given period, excluding those employees transferring to permanent employment, to the total number who worked in the Department during that period.

However, the evidentiary significance of the data is diminished by the fact that both the white and black attrition rates are substantially higher than the rates in any of the permanent departments.

tinues to be populated by an approximately eighty-five percent black work force [as of 1974]. From January 1, 1965 to December 31, 1974, of all the personnel hired into Prefabrication sixty-three percent were black. Sixty-three percent of *all* blacks hired between 1965 and 1974 were either assigned to the Stemmery or Prefabrication; almost two out of every three blacks hired. Yet only eighteen and eight-tenths percent of the whites hired during the same period were initially assigned to these two departments; almost one out of every five whites hired. A distinction between permanent and nonpermanent hiring is not borne out by the facts. Instead the argument is forced into the form that most whites desire only positions in the WSR and Fabrication Departments, which are filled nondiscriminately, and once denied these positions they will not accept employment in either Prefabrication or the Stemmery. In such a form it merely begs the question of why, percentage-wise, so many more blacks than whites are assigned to specified departments.[5] Furthermore, and this reasoning applies with equal force against the third component heretofore noted, no reason has been advanced as to why blacks, as opposed to whites, are so inclined to accept or prefer the seasonal and lower paying jobs of the Stemmery. It is clear from the evidence that blacks are qualified and do fill the permanent positions in the WSR and Fabrication Departments. The defendants do not claim, as has been heretofore noted, that the black applicants are, on the average, less able and qualified then white applicants. What perverseness makes blacks as opposed to whites more willing to accept what appear to be less desirable jobs?

The answer in the Court's view lies in the testimony of the plaintiffs' witness that "if you want to get hired, you know, being black, your best chance would be to go through the Stemmery and then transfer to permanent employment later." Philip Morris' history of segregated departments, and the continued dominance of blacks in the traditionally black departments, has led a substantial number of the blacks applying to Philip Morris for work to the understanding that their most likely opportunity for employment would be in the Stemmery. It is not surprising that the lines to the Stemmery hiring office are populated with aspiring black workers, nor is it surprising that blacks may, in interviewing, exhibit a preference for Stemmery work. It appears to a substantial number of black applicants that they either take a Stemmery job or look for work with another employer. Given this background, any notion of "preference" is meaningless; to prefer one alternative to another, one must believe that both alternatives are available.

■■ The Court is unable to find, however, on the basis of the record before it that the excessive assignment of blacks to the Stemmery was purposefully undertaken by the Company to covertly continue its historical system of segregated departments. What has been established is that the Company, although liberally proclaiming that it assigns new hires without regard to their race, has unfortunately done nothing to dispel the belief, founded on its past acts of discrimination, and held by a substantial number of black applicants, that it still assigns new employees to departments on the basis of race. Such a belief has translated itself into a set of circumstances that has continued to place blacks at a disadvantage when seeking employment at Philip Morris. The Company's professed neutrality is, in fact, not neutral, for past acts of discrimination continue to significantly affect modern practice. "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discrimi-

---

**5.** The evidence of white unwillingness to work in the Stemmery is also somewhat questionable in light of the 1965 statistics. In 1965 the Company hired only 68 blacks into the Stemmery as opposed to 186 whites, for a percentage of black hires of only 26.8 percent. That year represented a concerted effort to hire whites into Stemmery work. For all the other years for which the Court has been provided data, the percentage of black hires ran from 73 to 98 percent.

natory employment practices." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). *See also Quarles v. Philip Morris, Inc., supra.* The Company, in order to reassert a balance, should have informed all applicants for hourly positions at the beginning of any interview (1) of the positions currently available in each of the four departments with an appropriate job description, and (2) that it assigns and hires new workers without reference to race. All those class members that were not so informed when they were hired into the Stemmery, *and* that believed that their race substantially limited their initial employment to the Stemmery are entitled to recover for their losses. "What is required by Congress is the *removal* of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Griggs v. Duke Power Co., supra,* 401 U.S. at 431, 91 S.Ct. at 853. (Emphasis added) *Cf. Barnett v. W. T. Grant Co., supra,* 518 F.2d at 547; *Lea v. Cone Mills Corp.,* 301 F.Supp. 97, 102 (M.D. N.C.1969), *aff'd in part,* 438 F.2d 86 (4th Cir. 1971).

■ With respect to the plaintiffs' claims that the Company continues to maintain "male" and "female" job classifications within the Stemmery, and that transfers from the Stemmery face "male" and "female", and "white" and "black" job classifications within the permanent departments, the argument is similar. The Company answers the allegation with the contention that, although in the past discrimination patterns with regard to race or sex did exist, jobs are now available to all races and both sexes when openings are created by retirement, transfer, or expanded capacity demands. Additionally, it has introduced evidence of average pay levels to prove that the Company does not discriminate with respect to pay between the various job classifications with respect to race or sex. Finally, the defendants assert that males tend to avoid job categories in which females predominate, and that females are reluctant to qualify for jobs which require a high degree of mechanical skill. In light of the strong evidence of past acts of discrimination, and the evidence of present segregation among job classifications, it is the duty and the burden of the defendants to inform all potential applicants for the various openings of said openings as they develop and that these openings would be filled without regard to sex or race. Those applicants in the class that were not so informed *and* that would have applied for any such openings if informed, are entitled to recover.

■ The plaintiffs' attack the labor provisions governing seniority, transfer and promotion of seasonal employees on the grounds that they lock seasonal employees into seasonal positions. These provisions are discriminatory on racial or sexual grounds only if class members are assigned to seasonal positions on racial or sexual criteria. Since the Court has concluded that class members are often led to seek employment in the Stemmery on the basis of past racial discrimination, it must also conclude that the labor provisions that restrict the seniority, transfer and promotional rights of a seasonal employee so situated are likewise discriminatory. However, such a finding does not require a redrafting of the seniority, transfer, or promotion rules; it is the initial assignment policies that taint the system. The fact that Stemmery employees are more restricted in their transfer rights than permanent employees, without evidence of impermissible discrimination, would represent a justifiable policy. Seasonal employees are adjudged to be poorer workers on the whole and must prove themselves in a permanent capacity before they are given the rights and benefits of permanent workers. *See* Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h).

■ The defendant unions are liable with the Company to these class members that are able to recover under the theories heretofore noted, for the Union also has a

checkered past.[6] Along with the racially segregated departments of Philip Morris, there also existed racially segregated local unions. Local 209 of the Tobacco Workers' International Union represented only blacks in Prefabrication, Stemmery, and the janitorial staff. Local 203 of the Tobacco Workers' International Union, represented only whites in Fabrication and WSR. While separate unions existed, the Company and the unions negotiated unequal wages for the same work with blacks generally receiving the lower wages. In 1963, in response to a Presidential Executive Order, Local 209 and Local 203 merged; Local 203 became the surviving entity. Since the union's past indicates that it facilitated the Company's tradition of segregated departments, it also must share the responsibility for informing its members that all jobs are open in all departments without regard to race or sex so as to mollify members' present understandings as based on past history. Its failure to perform this function makes it jointly liable with the Company to those plaintiffs entitled to recover.

▉ The Court finds, however, that there is no evidence of arbitrary action or bad faith conduct on the part of the defendant unions towards the class members in the handling of class member grievances, see *Griffin v. International Union, United Automobile, A & A I W*, 469 F.2d 181 (4th Cir. 1972), or in representing the seasonal employees in the negotiation process with Philip Morris. Accordingly, the Unions were not guilty of breach of their statutory duty of fair representation.

Counsel will be directed to meet and brief the Court on the appropriate procedure for ascertaining the relief that should be made available to those class members entitled to recover in this cause. *See generally, Franks v. Bowman Transportation Company, Inc., et al.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 U.S.L.W. 4356 (1976);

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

An appropriate order will issue.

---

6. The International Union, due to its heavy involvement in Local 203's activities, is jointly responsible with the Local for the Union's failure to fulfill its duties to the union membership. *See Patterson v. American Tobacco Company, supra*, at 270–271. International was an active advisor to the Local, and sat in on most of the Local's negotiations with the Company for collective-bargaining agreements.