**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,**

v.

**ANDERSON'S RESTAURANT OF CHARLOTTE, INC., Defendant.**

No. C–C–86–002–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 3, 1987.

D. Marvin Jones, E.E.O.C., Charlotte, N.C., for plaintiff.

Philip M. Van Hoy, Mullins and Van Hoy, Joseph C. Travis, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court upon a Complaint filed by Plaintiff, Equal Employment Opportunity Commission ("EEOC"), against Defendant, Anderson's Restaurant of Charlotte, Inc. ("Anderson's"), in which the EEOC alleges that Anderson's has engaged in racially discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), and seeks relief for a class of black applicants for the position of waitress and cashier.

The trial of this case was heard before the undersigned without a jury from May 11 through May 13, 1987, in Charlotte, North Carolina. The EEOC was represented during these proceedings by Attorneys Donald M. Jones, Reuben Daniels, Ronald Arrington, Michael McGee, John Edmonds, and Humphrey Cummings, of the Legal Unit of the EEOC's Charlotte District Office. Anderson's was represented by Attorney Philip M. Van Hoy.

## FINDINGS OF FACT

(1) The Court has jurisdiction of this case pursuant to 28 U.S.C. §§ 451, 1331, and 1337, 1343 and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII; all jurisdictional prerequisites to suit have been satisfied.

(2) The EEOC is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Section 706(f)(1), 42 U.S.C. § 2000e–5(f)(1).

(3) Anderson's is a North Carolina corporation and since 1946 has operated as a family-owned restaurant located on Elizabeth Avenue in Charlotte, North Carolina. Anderson's has at all times pertinent to this action employed more than 15 persons and, under Section 701(b), (g), and (h) of Title VII, 42 U.S.C. § 2000e(b), (g), and (h), is an employer engaged in an industry affecting commerce.

(4) The EEOC contends that Anderson's has since January, 1979 maintained an illegal pattern and practice of failing or refusing to hire blacks as waitresses or cashiers, that Anderson's did so on the basis of race thereby depriving certain black applicants the equal employment opportunities guaranteed under Title VII. The EEOC also contends that Anderson's has unlawfully failed to post proper equal employment opportunity posters. Based on its most recent Claimant's List, filed June 25, 1987, the EEOC seeks relief for the following seven claimants whom it contends were denied employment by Anderson's as either waitresses or cashiers because of their race: Joyce Mitchell, Renee Jeffries, Penelope Pendergrass, Cynthia Lincoln, Janice Clyburn, Diana Hill Sanders, and Regina Linsay. (The Court will make specific factual findings concerning each of these individual claimants further in its discussion.) The EEOC seeks instatement to positions of waitress and cashier for all the applicants, and back pay for Mitchell, Jeffries, Pendergrass, and Lincoln. The EEOC, in addition, seeks an injunction and monetary penalty against Anderson's for its failure to post equal employment opportunity posters.

(5) This action arose out of a charge filed by Edna Harrison, black, on April 29, 1983,

alleging that she was discharged on account of race and that Anderson's, among other things, discriminated against blacks by refusing to hire them in positions of cashier and waitress. (EEOC Ex. 1, Charge of Discrimination.) Although the EEOC found that no reasonable grounds existed to believe Harrison was discharged on account of her race and although Harrison is not a party or claimant to this lawsuit, the EEOC determined that Anderson's maintained since January, 1979, a pattern and practice of failing or refusing to hire blacks as waitresses and cashiers on the basis of race in violation of Title VII, in particular, a class of black applicants who unsuccessfully sought employment with Anderson's.

(6) After efforts of conciliation failed, the EEOC instituted this action on January 3, 1986.

(7) Anderson's at all material times has maintained the following non-salaried job categories: waitress, cashier, bus help and cook.

## STATISTICAL SHOWING

(8) Anderson's hired 44 waitresses in 1979, six in 1980, 16 in 1981, (EEOC Ex. 71), at least seven in 1982, and 14 from January to September, 1983. (Plaintiff's Ex. 22, Interrogatory Response No. 6.) Anderson's hired eight persons as cashier from February 1982 until December 1983. *Id.*

(9) EEOC Investigator Bill Convey testified that he was able to identify 29 persons who applied for the position of waitress from January 1, 1982 through October 24, 1983. Of these unsuccessful applicants, Convey determined that nine were black, seven were white, and for 13, race could not be determined. (Tr. 103.) Presumably, three of the nine blacks are claimants in this action.

(10) Convey also testified that he identified 48 persons who applied for the position of cashier from January 1, 1982 through October 24, 1983. Of these unsuccessful applicants, Convey determined that 10 were black, 15 were white, and for 23, race could not be determined. (Tr. 103–04.) Presum-

ably, five of the ten blacks are claimants in this action.

(11) Anderson's hired no blacks as cashier prior to 1984. (EEOC Ex. 23, Admission No. 21.) Nor did Anderson's hire any blacks as waitress from 1979 through April 30, 1983. (Tr. 498–500; EEOC Ex. 22, Response to EEOC Interrogatory No. 6; G. Anderson Dep. p. 49.) During her deposition Betty Ann Lawton, in her 10 years experience as a waitress at Anderson's, was unable to name any black waitress prior to 1983. (EEOC Ex. 45, Dep. Betty Lawton, p. 17.) Further, from February 1982 through April 1983, Anderson's hired only blacks as cooks or bus help (EEOC Ex. 22; Tr. 498–500.) Anderson's has hired at least one black waitress immediately before the time period during which the claimants applied in May, 1983, but after Edna Harrison's initial charge of discrimination; and Anderson's has hired other black waitresses since. (Tr. 430, 518; EEOC Exhibit 22.)

(12) The Court took judicial notice that blacks supply 20 percent of the general labor force in Charlotte, North Carolina. (Tr. 362, EEOC Ex. 90.) Further, EEOC's Exhibit 90 shows that, in 1980, the United States Department of Commerce, Bureau of Statistics, determined that the total work force of waiters and waitresses in the Charlotte area included 2,806 persons, 366 males, and 2,440 females. Of those persons, 412 were black; and of all the blacks, 315 were female. Thus, the EEOC's evidence shows that black female waitresses contribute approximately 11.2 percent of the total waiter/waitress labor force and 12.9 percent of the total waitress labor force.

(13) The Court granted Anderson's Motion in limine to exclude expert testimony because of the EEOC's continued refusal to disclose its anticipated expert's identity until shortly before trial, in direct defiance of an Order of this Court. Thus, the EEOC presented no expert testimony establishing a statistical analysis of Anderson's hiring practices nor did the EEOC make any presentation of the statistical significance of the Anderson's hiring practices between

1979 and 1983. The EEOC contended that, for the time period in question, statistics are unnecessary because Anderson's hired zero blacks into positions of waitress and cashier. The EEOC, therefore, argues that since Anderson's was shown to have hired waitresses and cashiers during this time period, and since the EEOC has established that blacks were available, then a prima facie case of discrimination exists. This contention is based upon the testimony of Hood and Convey, and is opposite the testimony of Gary Anderson that he was certain that he knew of no blacks that applied for waitress or cashier from the time he went to work full-time in 1979 until shortly after the filing of the Edna Harrison charge in late April, 1983. (Tr. 465–66, 482–83.)

(14) During the 15–month period immediately preceding the original charge of discrimination, from February 1982 through April 1983, Anderson's hired 46 people: 14 were white, 32 were black. (EEOC Ex. 22, Interrogatory Response No. 6.) All of the cooks or buspersons hired were blacks, and all of the waitresses and cashiers hired were white. The putative class members applied from June 30 through September 30, 1983.

(15) The statistical composition of Anderson's work force as of July 6, 1983, showed that Anderson's employed:

(a) seven cashiers, all white;

(b) 12 waitresses, all white;

(c) 14 cooks, all black;

(d) 10 buspersons, all black, except for one white dishwasher.

(EEOC Ex. 23, Ex. G.; Anderson's List of Current Employees as of July 6, 1983.)

(16) Gary Anderson, however, credibly testified that Anderson's has employed, prior to the filing of the EEOC charge, at least four white cooks and at least three white buspersons. (Tr. 389, 428–29), thus rebutting the EEOC's contention that Anderson's has systematically engaged in racial job segregation. There was ample testimony that black employees had constant contact with customers, also disprov-ing the EEOC's contention of systematic job segregation to reserve customer contact jobs for white waitresses and cashiers. (Tr. 413–14.) Barbara Price, a witness for the EEOC, testified that as a busperson she frequently came into contact with customers while carrying out such duties as setting up tables while customers sat at tables, and refilling beverage glasses. (Tr. 190–91.) Also on the matter of job assignment discrimination, the EEOC presented no evidence that black employees were paid less than white employees. To the contrary, the evidence at trial showed that some cooks make more than some waitresses and cashiers, (Tr. 458), and that no cook has ever requested to transfer to a waitress or cashier position but several waitresses, including blacks, have requested transfers to cooks or bus positions. (Tr. 460–61.)

(17) Further, the EEOC knew, based on her May 1986 deposition, that Regina Linsay, a black claimant, worked as a waitress for Anderson's in 1976 and 1983, (Tr. 531, Anderson's Ex. 5), also disproving its theory of perfect and systematic racial job segregation.

## JOB OPENINGS

(18) The EEOC showed that Anderson's ran advertisements in *The Charlotte Observer* during 1983 concerning vacancies for waitress and cashier on the following dates:

| Dates of Advertisements | Position |
| --- | --- |
| 7/1–7/7 | Waitress |
| 7/14–7/31 | Cashier |
| 8/1–8/8 | Cashier |
| 9/8–9/14 | Waitress |
| 9/16–9/21 | Waitress |
| 9/23–9/30 | Waitress |
| 10/1–10/4 | Waitress |
| 10/5–10/16 | Waitress |

(EEOC Ex. 23, Admission No. 26.)

(19) The EEOC also showed that during this same time period, Anderson's hired the following persons, all white, to fill positions as waitress and cashier on the approximate dates:

| Approximate Date of Hire | Name | Position |
|---|---|---|
| 6/15–6/30 | Kathleen Lewis | Waitress |
| 7/1–7/15 | Bobby Sorenson | Waitress |
| | Ketia Hurst | Waitress |
| 7/16–7/30 | Skyland Pope | Cashier |
| 8/16–8/30 | Adela Scarano | Waitress |
| | Linda Gerrard | Waitress |
| 9/1–9/15 | Catherine Lewis | Waitress |
| 9/16–9/30 | Susan Hazelett | Waitress |

(Tr. 134–153, EEOC Ex. 22, Response to Interrogatory No. 6.)

(20) Anderson's placed its advertisements for positions to fill a specific vacancy as the need arose and to elicit a current inventory of applicants because employees would often quit without notice, thereby necessitating the immediate hire of a replacement. (Tr. 61, 147, 445–46, 525–26, 533, Ex. 12.)

(21) The Court does not find supportable the assertion of EEOC Investigator William Convey who testified that, based on certain investigatory notes, not admitted into evidence, and Anderson's payroll records, Anderson's Ex. 71, there was a direct correlation between immediate vacancies at Anderson's and the running of the advertisements evidenced by a pattern of filling vacancies within four days of placing an advertisement. (Tr. 134–53.) The Court does not find that vacancies were necessarily filled within four days of the running of an advertisement. The payroll records reflect the pay period in which a newly-hired employee was first hired. Anderson's pays its employees twice monthly, and the newly-hired employee would first appear on the payroll records on the last day of the pay period. For instance, an employee hired on the first day of the month would show up on the payroll record ending on the 15th day of the month.

(22) All of the seven claimants applied at Anderson's between June 30, 1983 and September 27, 1983: two applied for waitress, three applied for cashier, one applied for cashier or waitress, and one applied for cashier or cook. According to EEOC's Exhibit 22, Anderson's filled seven waitress vacancies during this period and one vacancy for cashier. The Court, therefore, finds that during the general time period when the claimants applied, Anderson's had vacancies for at least seven waitress positions and one cashier position. According to the EEOC's own evidence, only one of the claimants could have been hired as a cashier, and only three could have been hired as waitresses. In addition, this does not mean that a specific opening existed at the time an individual claimant applied, for Anderson's did not keep records of exact hire dates and the EEOC did not present evidence through the hiree's themselves of their actual dates of hire or otherwise show that when each claimant applied there was a specific opening for the position sought. This is a matter, obviously, left for the Court to make liberal inference.

(23) The following list of claimants and dates they allegedly applied, when compared with the approximate dates of the actual hires, as gathered from EEOC's Ex. 23, shows that vacancies existed during the relevant time period, but certainly does not show that actual vacancies existed for each claimant's application.

| Claimant | Date of Application | Position | Hiree |
|---|---|---|---|
| Renee Jeffries | 6/30/83 | cashier or waitress | 6/15–6/30/83, Kathleen Lewis, waitress, white; 7/1–7/7/83, Bobby Sorenson, waitress, white; 7/15/83, Skyland Pope, cashier, white; |
| Joyce Mitchell | 7/83 | cashier | 7/15/83, Skyland Pope, cashier, white; |
| Penelope Pendergrass | 7/83 | cashier | 7/15/83, Skyland Pope, cashier, white; |
| Cynthia Lincoln | 7/83 | cashier | 7/15/83, Skyland Pope, cashier, white; |
| Janice Clyburn | 8/83 | cashier or cook | 7/15/83, Skyland Pope, cashier, white; |
| Diana Hill Sanders | 9/83 | waitress | 9/1–9/15/83, Catherine Lewis, waitress, white; 9/16–9/30/83, Susan Hazelett, waitress, white; |
| Regina Linsay | 9/27/83 | waitress | 9/16–9/30/83, Susan Hazelett, waitress, white; |

## QUALIFICATIONS

(24) There is no particular educational requirement for either the positions of waitress or cashier, other than the ability to read and write. Anderson's sells some alcoholic beverages, so at all times material to this lawsuit it employed only waitresses who were at least 18 years of age. (Tr. 414.)

(25) Applicants must be available to work a full-time schedule, which may include nights and weekends. (Tr. 416–417, 441–442.) Anderson's does not hire part-time employees and has not in the past. (Tr. 414, 477, 505–509.) Anderson's satisfies its need for part-time substitute employees by calling in former full-time employees on an "as needed" basis; these are former employees who have decided to work less hours because of advanced age or other personal reasons, (Tr. 414, 477, 505–509), and Anderson's does not guarantee to them any fixed amount of hours per week. (Tr. 415.)

(26) Further, applicants for waitress positions must be willing to work for an hourly rate of $2.01, (Tr. 476), plus tips, which the parties stipulated to be $12.00 per day. Anderson's sets its compensation for cashier positions on prior experience and performance. (Tr. 420.) The cashier minimum wage is $3.65 an hour, and Anderson's highest paid cashier, Betty Hendrix, makes $6.00 per hour, but she has worked at Anderson's on and off for 15 years, handles responsibilities in addition to cashier, such as scheduling waitresses, and Anderson's raised her current hourly rate less than one year ago. (Tr. 420–21.)

(27) Anderson's hours of operation require that its employees be reliable and punctual, and applicants with a prior history of continued tardiness are not hired at Anderson's. (Tr. 444, 449, 473–74.) Nor does Anderson's hire applicants who have been fired from past jobs for fighting, (Tr. 475), or applicants who have changed previous jobs more than four or five times within a year. Anderson's does not hire full-time students because of availability problems, although some high school students do come in at night for bus help. (Tr. 474.)

(28) In filling waitress and cashier positions, Anderson's puts a very heavy emphasis on experience, and on subjective qualities such as neatness of appearance, positive attitude, pleasantness, etc. (Tr. 446–48, 455–57.) Anderson's has never hired a cashier without previous experience, (Tr. 446); and has only rarely hired waitresses without previous experience when there was a shortage of help and the applicant conveyed strong qualities of enthusiasm and capability. (Tr. 491–93, EEOC Ex. 45, p. 9.) The EEOC showed that at least three waitresses had been hired by Anderson's without prior experience, (Tr. 491–95, 116); credible testimony of Gary Anderson, however, showed that of the few waitresses hired without experience, most all of them were hired several years ago, long before the facts giving rise to this lawsuit ever came into being. *Id.*

(29) Further, Anderson's prefers that waitresses and cashiers have "recent" prior experience. (Tr. 474–75.)

(30) The Court admitted the deposition testimony of Betty Ann Lawton and finds that, taken as a whole, her testimony corroborates the testimony of Gary Anderson with respect to Anderson's emphasis on hiring waitresses and cashiers with experience. (Plaintiff's Ex. 45.)

## SELECTION PROCESS

(31) During the general time period when the seven claimants applied at Anderson's, Gary Anderson, James Anderson, and Betty Ann Lawton were all involved in the selection process of waitresses and cashiers. When available, Betty Ann Lawton conducted the initial interview of an applicant, and would ask about their experience and when they were available to work, but she did not have independent authority to hire. Lawton would always refer the applicant to Gary or James Anderson for an interview if either of them were available. Lawton would make recommendations but the applicant was still interviewed by either Gary or James Anderson before being hired. (Tr. 423–24, 487.)

(32) Gary Anderson took over the primary management responsibilities of the restaurant in mid–1983 when his father became ill with Alzheimer's Disease (Tr. 437–38.)

(33) Gary Anderson testified that it was difficult to say whether he or his father, James Anderson, did most of the interviewing of applicants and that he did not know how many applicants there were. (Tr. 478–80.)

(34) Many applicants were not interviewed, at least at the time they filled out an application, for various non-discriminatory reasons. For instance, around meal times when the restaurant was busy, and generally from 9:30 to 10:30 a.m. when Gary Anderson took care of various business errands, no one was available to conduct interviews. When no one was available to interview applicants, cashiers were instructed to tell the applicant to call back and request for Gary Anderson to arrange for an interview. (Tr. 424, 437, 503–04.) Further, many applicants never returned for an interview when Gary or James Anderson were available. (Tr. 424–25.) Many applicants that were called for interviews could not be reached at the phone numbers listed on applications because the phone numbers were no longer in service or the person did not live there anymore. (Tr. 453–54.)

(35) The interview is a prerequisite to hiring, and Gary Anderson testified that he did not consider one's having applied if they had not interviewed. (Tr. 442, 486.)

(36) Anderson's has utilized the same application form since 1977. That application form does not elicit race, but does elicit the position sought and prior employment history. (Tr. 55, 440.)

(37) Gary Anderson testified that he would begin the interview by asking if the applicant was available for weekends because weekend availability is an important criterion. He would also ask about hours and to record their answer, he used the notations, "D" for day, "N" for night, and "A" for anytime. (Tr. 441–42.) The applicants were also asked about their prior employment as indicated on the application. (Tr. 443.)

(38) The only way Gary Anderson would know of an applicant's race is through the interview. (Tr. 483.) In explaining the selection process to EEOC Investigator Hood, Gary Anderson stated that one had to fill out an application and be interviewed. (Tr. 71–72.) The EEOC presented no direct evidence which necessitated a finding that Anderson's excluded from interviews black applicants or that there existed any unspoken policy or understanding that blacks would not receive interviews. Further, the EEOC presented no evidence that the unsuccessful white applicants or the unsuccessful applicants whose race was undetermined were denied or granted interviews. Gary Anderson testified that he knew of no blacks that applied for waitress or cashier positions from 1979 until May, 1983 after Edna Harrison filed a charge of discrimination with the EEOC. (Tr. 465–66; 482–83.) He also testified, unrefutedly, that no males have ever applied for these positions. (Tr. 447.)

(39) One claimant, Renee Jeffries, testified on direct examination that after filling out an application for either a waitress or a cashier job in June, 1983, the cashier instructed her to take it upstairs where she handed it to an older man, presumably James Anderson, who looked over the application and told her that he would get in touch with her. She then left. (Tr. 260–62.) That the older man did not ask Jeffries any questions concerning her application is not surprising since she was 18 years old with no restaurant experience at the time she applied, which was indicated on her application, and had only worked as a teacher's aid in 1981. *Id.*

(40) Contrary to Jeffries' testimony, Hood testified that claimants were not interviewed when they applied, but were instead simply told no positions were available. (Tr. 59.) The claimants themselves, while maintaining they were not interviewed, gave additional testimony to Hood's assertion that they were merely told no positions were available.

(41) Five other claimants each alleged that they were not asked to interview when they applied. All of the claimants who testified stated that they applied to Anderson's in response to an advertisement in *The Charlotte Observer.* Joyce Mitchell alleged that after she filled out the application for cashier in, first August, but later July, 1983, she turned it in and asked to be interviewed, but was told that she would be contacted if needed, (Tr. 231, 234, 238); she was never contacted. (Tr. 235.) Penelope Pendergrass declined to honor her trial subpoena, but during her deposition, testified that after she filled out an application for cashier in July, 1983, she was told that the manager was not available, that there was no openings for cashier or waitress, and that her application would be kept on file. (EEOC Exhibit 41, p. 8–11.) Cynthia Lincoln alleged that when she applied for a cashier position in July, 1983, she was not interviewed or ever contacted by Anderson's. (Tr. 275, 279.) She further testified that she called Anderson's back when she saw the ad in the paper again, but she did not remember what happened. (Tr. 280.) Janice Clyburn testified that after she turned in her application for a cashier or cook position in August, 1983, she was told that she would be contacted if Anderson's decided to hire, but that she was never contacted. (Tr. 206–210.) Diana Hill Sanders testified that when she applied in September, 1983, for a waitress position, she was told that the head waitress was not available but that the application would be reviewed by the head waitress and she would be contacted. After not hearing from Anderson's, Sanders later telephoned and was told by the head waitress that the position had been filled. (Tr. 301–304.) The EEOC, curiously, did not call Regina Linsay as a witness nor did it offer her deposition testimony into evidence. Thus, the Court has no indication of whether she filled out an application or was interviewed, other than the testimony of Investigator Hood that Linsay filled out an application form and that she applied on September 27, 1983 for a waitress position. As stated previously, Renee Jeffries received an interview, albeit brief due to her total absence of experience.

(42) The Court finds that the testimony, on the whole, of each and every one of these claimants is so fraught with inconsistencies and contradictions that it can hardly be deemed reliable or credible, a matter which will be discussed more fully with respect to each claimant. Not one of these claimants complained of discrimination by Anderson's, one refused to honor a trial subpoena, and the EEOC chose not to call another nor did it offer her deposition testimony into evidence. Obviously, these claimants were solicited by the EEOC and informed of this lawsuit and its possible effects upon them; four have testified they received no interview, two did not testify on the issue, and one testified that, after filling out an application and at the direction of the cashier, she handed her application, which indicated no experience, to an older man who reviewed it and said he would be in contact with her. The Court does not agree with the unsubstantiated assertion of the EEOC that interviews were offered to every applicant as a standard procedure. The EEOC, as stated previously, has presented not even a scintilla of evidence that other unsuccessful white applicants were interviewed. Based on the most reliable testimony presented, when no one was available to conduct an interview, applicants were instructed to call back to arrange for one.

### OVERT DISPARATE TREATMENT

(43) Hood further testified, first, that of the 138 applications he reviewed, some had racial notations, but he later admitted that only three had racial notations, which included the words, "black," "black," and "nice black girl." (Tr. 29, 54.) These racial notations were handwritten on the face of the applications, and Hood claimed some of those applications were for waitress positions, (Tr. 30), at least the application with "nice black girl" on it, Hood recalled as being for a waitress position. (Tr. 29.)

(44) Georgia Helms also testified on cross-examination that she saw a white cashier make a racial notation on an appli-

cation when she first started working for Anderson's in 1981, although she did not know what position that person had applied for. (Tr. 388–89.) Anderson's presented no legitimate business reason, nor does the Court believe that it could, for the racial notations on applications, despite the fact that there were a large number of applications and evidence of only a slight few racial notations.

(45) The EEOC presented evidence through the testimony of Barbara Price, black, and a former busperson for Anderson's, that Georgia Helms tore up an application of a black person who applied at the restaurant. (Tr. 188.) Price stated that she saw Helms receive many applications from blacks but that only one was torn up. (Tr. 192–93.) Price also stated that she did not know whether Anderson's was hiring waitresses at the time she saw the application destroyed. (Tr. 192.) Price's testimony directly contradicted that of Georgia Helms who flatly denied ever destroying even a single job application. (Tr. 382.) Since two witnesses directly contradict one another on a factual matter, the Court views this allegation with a great deal of skepticism, and certainly not strong enough evidence for a finding of discrimination.

■ (46) The applications reviewed by Hood were never admitted into evidence because they were discarded by Anderson's between the date of Hood's on-site investigation and the EEOC administrative determination of discrimination. Gary Anderson testified that only he, his father, and Johnny Littlejohn, Anderson's accountant, had access to the applications on file in the restaurant office and that he, Gary Anderson, did not discard the applications. His father, referred to previously, has mentally deteriorated completely over the last four years as the result of the progressive symptoms of Alzheimer's Disease, and was unable to offer any testimony on this or any other issue in this trial. (Tr. 934–36; 437–39.) The Court does not, however, consider the discarding of applications on the part of Anderson's an indication of culpability or bad motive. Anderson's cus- tomarily retained applications for 60 days or so. When Hood conducted his on-site investigation, he was furnished all the applications on hand, which he stated to be 138. There was no document Hood asked for that was not furnished. Hood chose not to take the applications with him for copying as he was authorized to do, but instead relied on his handwritten notes, which were not admitted into evidence. (Tr. 63–64.) The EEOC noticed Anderson's on May 12, 1983 of Edna Harrison's April 29, 1983 charge of discrimination, and the concomitant requirement to preserve all personnel records relevant to the charge was set forth in the notice. (EEOC Exhibit 23, Exhibit B.) Even after being informed by Anderson's predecessor counsel that Anderson's periodically discarded applications and after noticing Anderson's of the charge of discrimination, EEOC Investigator Bill Convey, during his investigation, failed to inform Anderson's, a small employer with almost no prior experience with the EEOC, (Tr. 422–23), that the EEOC regulations required the retention of records during an investigation. (Tr. 121–22, EEOC Exhibit B.) Also, Edna Harrison's charge of discrimination, which included a charge of discrimination in refusing to hire blacks as waitresses or cashiers, was precipitated by Harrison's discharge as an employee of Anderson's, not refusal to hire.

## INDIVIDUAL CLAIMANTS

(47) The Court received the testimony of several of the claimants in support of their individual claims of disparate treatment. **Joyce Mitchell** testified she applied at Anderson's for a cashier's position after seeing an advertisement in the paper. Mitchell testified she put on the application her experience as a cashier at Sonny's Chicken and as a waitress at Holly Farms in 1981, and that she had a two-year degree in accounting. (Tr. 232–33.) Mitchell contradicted herself on direct examination about when she applied at Anderson's, saying first that she applied in August, 1983, then minutes later saying she applied in July, 1983. (Tr. 231, 238.) At her deposition she testified first, that she applied in

1984 or 1983, and then that it was around July, 1983. (Tr. 240.) She attempted to explain away her equivocation by claiming she was made confused and nervous by Anderson's counsel's questions, but the EEOC attorney conceded that at that time of the deposition, Anderson's counsel had not asked a single question. (Tr. 241.) Mitchell could not state what time of day she applied. (Tr. 243–44.) Mitchell also testified that the advertisement in *The Charlotte Observer* did not identify the employer, (Tr. 242), in direct contradiction to the EEOC's own Exhibit 13, a reproduction of the actual advertisement which included the name of the restaurant, and the testimony of every other witness questioned on the advertisement. (Tr. 213, 275, 300, 465.) Further, Mitchell testified that when she went to the restaurant to apply she found its location by inquiring at a florist shop. (Tr. 251.) The restaurant has, however, never been across the street from a florist shop. (Tr. 464–65.) Mitchell also testified that she applied at a restaurant that had "bench-type" seats, (Tr. 251–252), in contradiction of Gary Anderson's testimony that the restaurant has never had "bench-type" seats. (Tr. 464–65.) Mitchell also testified that the application she filled out consisted of two pages, (Tr. 243), also in contradiction of other, more credible testimony that the application consists of one page. The Court found other numerous inconsistencies between Mitchell's trial testimony and deposition testimony. In observing Mitchell's demeanor and responsiveness on the witness stand, and in view of the numerous inconsistencies and contradictions, the Court finds Mitchell's testimony, as a whole, incredible and unreliable. Thus, her assertion that she filled out an application and asked to be interviewed but was told she would be contacted is incredible.

(48) **Renee Jeffries** testified that she applied at Anderson's for a cashier or waitress position in response to an advertisement in the paper. (Tr. 260.) EEOC Investigator Hood testified that, based on his review of the applications, Jeffries applied only for a waitress job, (Tr. 43), but later during cross-examination, testified that his notes indicated Jeffries applied to be either a waitress or a busperson, (Tr. 45), just another example of the contradictory testimony so characteristic of the EEOC's case. The EEOC would have the Court ignore these contradictions concerning specifics of the claimants applying at Anderson's, but it is the specifics of the occurrences and the claimants' demeanor and responsiveness in recounting them that best indicate credibility and reliability, characteristics which the Court deems woefully lacking in the EEOC's case. Jeffries also testified that she had no prior waitress or cashier experience, but her only working experience at all was a part-time, after-school job at a local school for students who did not like public schools. (Tr. 43, 260–270.) By her own admission, Jeffries had no relevant work experience as a cashier or waitress, which the Court has already found to be a qualification criterion of Anderson's. Further, the EEOC produced no persuasive evidence that a vacancy existed for a cashier's position in June, 1983 when Jeffries allegedly applied; the EEOC's own exhibit showed that no advertisement was run for a cashier position when Jeffries applied. The Court has already found that advertisements were sometimes run to elicit an inventory of applicants, and the only cashier hired during this general time period was Skyland Pope around July 15, 1983. Jeffries' testimony that she was directed to take her application to an older man who briefly reviewed it rebuts the EEOC's contention that black applicants were systematically precluded from interviews. It is understandable why, after noticing her total absence of relevant experience, James Anderson would feel there was not any reason to discuss her application with her further.

(49) Claimant **Penelope Pendergrass** obviously felt that any benefits she stood to gain from participating in this lawsuit were not worth honoring her subpoena to appear for testifying at trial since she failed to appear and the EEOC was unable to contact her to find out why. Instead, the EEOC introduced as evidence the deposition of Pendergrass, EEOC Exhibit 41, and

the back pay exhibit calculated for her, EEOC Exhibit 75. Pendergrass could not remember when she applied to Anderson's, only that it was sometime in 1983. (EEOC Exhibit 41, p. 6.) The EEOC's attempt to refresh the memory of Pendergrass as to when she applied effectively substituted for her failure of memory the date the EEOC believed she applied based on the investigator's notes. *Id.*, pp. 6–8. Further, Pendergrass did not remember whether she applied for a cashier or a waitress position. She did state that she had cashier experience, *id.*, p. 10, and although the claimant herself could not state so, the EEOC contended that she applied for a cashier's position on July 27, 1983, based on Hood's recollection refreshed by his investigatory notes. (Tr. 43.) Pendergrass also testified at her deposition that whenever she applied, she was told that the manager was not in; that a position was not available at that time; and that the application would be kept on file. She never tried to contact Anderson's after that. *Id.* p. 11. Further, the EEOC's own Exhibit 75 indicates that Pendergrass applied for a part-time position. She was in school at the time she applied, (EEOC Exhibit 41, p. 13), and stated that if she would have taken a job at Anderson's, she would have gone back to school the next semester. *Id.*, p. 14. The Court's finding that Anderson's did not hire part-time employees, (Tr. 414, 477, 505–509), thus precludes a finding that this claimant would be qualified for a job or that she was treated any differently than a white applicant for a part-time position would have been treated.

(50) Claimant **Cynthia Lincoln** testified that she applied at Anderson's for a cashier position in July, 1983 after seeing an advertisement in the newspaper. (Tr. 275.) The EEOC contended that, based on the refreshed recollection of Investigator Hood, Lincoln applied on July 29, 1983. (Tr. 41.) Lincoln put on the application her experience as a cashier to be one year, (Tr. 276–77), but contradicted herself on cross-examination testifying to a different version that her actual cashiering experience was for a total of five or six months, ending in early 1978, over five years before she believed

she applied with Anderson's. (Tr. 285–86.) The EEOC, again, failed to present any evidence that there existed a specific job opening at the time Lincoln applied, but showed only that Skyland Pope was hired on or around July 15, 1983 as a cashier. The EEOC's evidence, as noted before, showed only that one cashier vacancy was filled in this general time period. Interestingly enough, when asked by the Court, Hood testified that his notes indicated Pope had five years experience in an amusement park as a cashier and in an amusement shop. (Tr. 78.) Anderson's has never hired any cashier without prior experience, (Tr. 446, 456–457), and Anderson's looked for applicants with "recent" prior experience when possible. (Tr. 443, 474–475.) Lincoln's account of her prior work history was confused and convoluted, (Tr. 288–89, 297–98), had an unreliable recollection of when she applied. (Tr. 300.) Taken as a whole, Lincoln's testimony, like that of the other claimants, is neither consistent nor reliable on the issues of when she applied or that she was qualified.

(51) Claimant **Janice Clyburn** testified after refreshing her recollection from the EEOC's Exhibit 59, Clyburn's Affidavit, that in August, 1983, she applied for either a cashier or cook position at Anderson's in response to an advertisement in the paper. (Tr. 205–06.) Clyburn could not remember whether she applied for part-time or full-time. (Tr. 206.) The Court has found that Anderson's only hired outside applicants into full-time positions, thus Clyburn's proof of qualification is insufficient. (Tr. 414, 477, 505, 509.) Clyburn's testimony was, in the opinion of the Court, not credible or reliable. The Court observed at trial that she did not "remember much of anything." (Tr. 230.) Clyburn gave a different version, as did the other claimants that testified, at trial from that of her deposition concerning whether she had a conversation with EEOC Investigator Bill Convey. (Tr. 212–13.) Convey testified that he had referenced in his notes after talking to Clyburn that she was not interested in working at Anderson's. Clyburn's account of her work history was poor, claiming to

have been both working and unemployed when she applied at Anderson's. (Tr. 217–19.) Clyburn's trial version of how many times she applied at Anderson's was inconsistent with her deposition version. (Tr. 220–21.) Clyburn had difficulty remembering whether she was 18 or 22 when she applied. (Tr. 209.) Although she claimed to have cashier experience at two fast-food restaurants, she had difficulty remembering when she worked at each place. (Tr. 207–08.) Clyburn testified at trial that she graduated from high school in 1985 and admitted that at her deposition her testimony that she graduated in 1979 was not the truth. (Tr. 215–16.) Clyburn further admitted that she was fired by at least one previous employer, for excessive tardiness, but did not remember whether she had indicated this on her application with Anderson's. (Tr. 214, 216, 226, 229–30.) The Court has found that Anderson's did not hire applicants, regardless of race, with a history of excessive tardiness since its hours of operation require that its employees be punctual. Thus, Clyburn's proof of qualification is again insufficient. (Tr. 444, 449, 473–74.)

(52) Claimant **Diane Hill Sanders** contradicted her deposition testimony that she thought she applied for a waitress position at Anderson's in November, 1983, when she testified at trial that she applied in September, 1983. (Tr. 302, 308.) Hill testified that she had seven years waitress experience with other local restaurants when she applied with Anderson's, but that she did not indicate this experience on her application, instead she listed only the places where she had worked, and excluded from that her four years prior employment as a waitress with the Charlotte City Club where she was fired for fighting. Hill deliberately omitted her prior employment and experience with the City Club because she did not want Anderson's to know she had been fired from there for fighting. (Tr. 303, 310, 314.) From the claimant's own testimony, the Court finds both her credibility impeached and a valid reason for her disqualification from hire based on the testimony that Anderson's does not hire applicants who have been fired by a prior

employer for fighting, (Tr. 475.) Hill also testified that when she applied at Anderson's she was working part-time at Jester's (Tr. 312, 317.) Hill testified that she left Jester's in November, first, because of low pay and baby-sitting problems, then later, because it went out of business. (Tr. 311–13, 317.) The testimony further revealed that Anderson's paid its waitresses the same hourly wage as Jester's, (Tr. 310–11, 419, 476), and although Sanders did not know the compensation rates were not the same, (Tr. 311), there is no reason to believe that she would pursue employment at Anderson's had she known this, or that she would have been able or willing to work on a full-time basis, thereby disqualifying her from hire at Anderson's. Further, Sanders testified at her deposition that she did not seek further employment after she applied at Anderson's and after she left Jester's until 1985, but at trial testified that she began seeking employment about two months after leaving Jester's. (Tr. 313, 317, 320.)

(53) As previously stated, the EEOC did not call claimant **Regina Linsay** as a witness, nor did it offer her deposition testimony into evidence. Investigator Hood had no recollection of Linsay's application at Anderson's, until reviewing his unintroduced notes to refresh his recollection that he had referenced her as having applied for a waitress position at Anderson's, first on September 24, 1983 and then on September 27, 1983. (Tr. 38–40.) Hood testified that Linsay had listed five years experience on her application. (Tr. 40.) For purposes of proving mitigation, the EEOC did introduce Exhibit 81 which included Investigator Convey's notes on Linsay, and an unsigned affidavit completed in Convey's handwriting which stated that when Linsay went to Anderson's to apply on September 27, 1983, James Anderson told her that the waitress position had already been filled, and that the head waitress also told her the position had already been filled, but if that person did not prove satisfactory, they would contact her. Linsay was never contacted, but Convey also wrote down that Linsay worked for Anderson's as a waitress in

1976 for about a month. (EEOC Exhibit 81; Tr. 158–59; Anderson's Exhibit 5.) Convey later testified that Linsay eventually signed an identical affidavit which was attached to her deposition. The EEOC has failed to offer any other evidence on behalf of Linsay, leaving the Court to rely on the scanty refreshed recollection of the EEOC's investigators.

## CREDIBILITY AND RELIABILITY OF TESTIMONY

(54) There were numerous other inconsistencies in the testimony of the EEOC's witnesses. For instance, Hood initially testified claimant Jeffries applied as a waitress, but on cross-examination and after he had to be reminded of his testimony earlier that morning, admitted that his notes indicated she applied for a busperson or waitress position. Hood also gave testimony on direct examination while referring to his notes that non-claimant Symanthia Henderson applied for a waitress position, but admitted on cross-examination that his notes indicated she applied for a bus or waitress position and that he had omitted referring to the bus position. The Court believes such slanting of the testimony was deliberate and, when taken in light of Hood's complete testimony, finds that Hood often testified deceptively. Another instance which the Court finds characteristic of Hood's slanted testimony occurred on cross-examination when counsel asked Hood what position he had testified that applicant Darlene Pegram had applied for. Hood had testified on direct that Pegram applied for a waitress position, but he admitted on cross-examination that his notes did not specify that she applied for a waitress or cashier position, but that she applied for "anything." (Tr. 49–50.) On redirect, the EEOC attempted, unpersuasively, to rehabilitate Hood's testimony on this matter; he stated that he felt there was no inconsistency with his testimony, after all, an application for "anything" would certainly include "waitress," (Tr. 74–76; 87), as well as cook, bus help, dishwasher, etc.

(55) Hood testified that his notes included the abbreviation "app." before the dates of same, but not all, applications for employment. He unconvincingly explained that this abbreviation was for "applied" rather than "approximately." Hood admitted, however, that the columns in his notes in which this abbreviation appeared were exclusively for dates of application—using the abbreviation for "applied" would have been redundant, and the abbreviation only appeared before certain names of applicants, even though an alleged date of application appeared after the name of each applicant. (Tr. 46–48.) Hood could not recall his reasons for recording his notes this way. Much of the EEOC's evidence is based upon the recollections of Hood and Convey refreshed from investigatory notes, particularly Hood's on-site notes. In considering issues of credibility, reliability and veracity, the Court does not find the suspicious, incomplete, and unreliable testimony of Hood regarding his technique and reasons for taking certain notes supportive for the EEOC's case.

(56) When asked about whether he inquired of either Gary or James Anderson concerning the notations of race on applications, Hood could not recall, but would not deny, that Gary Anderson had told him an "N" stood for night and "D" for day. (Tr. 43–49.) When the memory of a witness appears to be so consistently selective as Hood's, as well as other witnesses for the EEOC, there is reason to doubt the overall reliability of their testimony.

(57) Hood testified that he reviewed applications from 1980 to 1983, but that those applications may have included people who had been employed from 1980 and earlier; he could not recall, again, what time period was represented by the applications for those persons who had not worked for the restaurant. (Tr. 51–52.) The significant feature of this testimony is that Hood's recollection always appeared selective and incomplete and where so much of the EEOC's case is clearly derived from Hood's notes, they should be capable of passing various tests of reliability, which they did not. The Court, having already determined that Anderson's conduct in discarding the applications not to be an indication of bad faith, believes that Hood should have used

his opportunity to copy the applications during his investigation pursuant to his authority. All the evidence is clear that Anderson's cooperated with Hood in every way, and never refused a single item he requested. Because Hood elected not to do so, (Tr. 62, 63), and the EEOC chose to proceed anyway, an important link in the chain of the EEOC's case emerges as critically weak.

(58) Both Hood and Convey testified that they made very little effort to determine who had been hired instead of any of the claimants for either cashier or waitress jobs. (Tr. 56, 116, 135.) The EEOC's own evidence showed that Anderson's cooperated fully with their investigation and nothing prohibited them from interviewing and subpoenaing actual hirees, (Tr. 136), which is what the EEOC should have done to provide the Court with an accurate picture of comparable qualifications. Evidently, the EEOC did not think this aspect of preparation warranted any effort, since none was made, but it easily could have been, and believes that the Court will simply infer whatever the EEOC asserts as true.

(59) The testimony of Hood and Convey showed that many applications listed no job experience, that the races of a large percentage of the applicants were not determined, and that where experience was listed, they, for the most part, assumed it accurate and truthful. Hood stated that he did make some effort, in follow-up phone calls, to confirm the accuracy of "a few" applicant's claimed experience. Whether that "few" included any of the claimants was not addressed. (Tr. 40–43, 50–51, 54–56, 61–62, 68, 101–104, 135.) During trial, the experience claimed by some claimants was revealed not to be true. Further, Hood and Convey testified that they made no effort to determine why applicants had left their prior employment, (Tr. 61–62, 68, 135), considerations that Anderson's took into account in decisions about whom to hire. (Tr. 443–44, 473–75, 509.)

(60) The Court also finds it significant with respect to Hood's notes that he claimed to have taken notes on every single application he reviewed out of 138, choosing not to copy the same, and doing so within one afternoon. (Tr. 25, 62.)

(61) Each claimant testified during their depositions that no one from the EEOC had contacted them regarding their mitigation efforts, and the EEOC itself responded to discovery in May 1986 that information relating to mitigation was unknown (Anderson's Exhibit 10); Convey, however, testified to the contrary that he interviewed each claimant and specifically asked them about their mitigation efforts. (Tr. 116–17, 120–21, 129–32.) At trial, the claimants all changed their deposition testimony, testifying that they were asked about subsequent employment, even though some admitted on cross-examination that they did not recall whether they had been contacted by the EEOC regarding subsequent employment and mitigation efforts.

(62) Convey was asked in reference to his own unintroduced investigative memo of November 30, 1984, which he testified from and which formed the basis of his finding of discrimination, concerning Anderson's placing of advertisements and responded by quoting from his memo: "[A]dvertisements are placed in the newspapers periodically. An attempt is always made to hire persons for these positions with prior work experience. Occasionally, a prospective employee will be hired with no prior experience because of positive attitude and expressed interest and desire to work." (Tr. 125–27.) Nonetheless, the EEOC insists on alleging otherwise, and without any persuasive or credible evidence to the contrary. While being questioned from that same unintroduced investigative memo, Convey was unable to answer questions posed by Anderson's counsel because he had no recollection, and the last page of the memo used at trial ended in the middle of a sentence, without a hint of how many pages were missing or what they included. (Tr. 128.) This appears to be yet another strange, but not surprising, question which reflects the lack of reliability of the EEOC's case. If the Court is expected to accord reliability and credibility to Convey's testimony, it is important to have the opportunity to have him testify fully on his

own investigative memo which formed both his administrative finding of cause to believe discrimination existed and his trial testimony. This is another example of selective recall, which adds more suspicion to Convey's testimony and the EEOC's case as a whole. Further, Convey had difficulty matching his notes he used to make his determinations during his investigations for some of the claimants' employment histories, and in the case of Regina Linsay, he could not remember which notes he used. (Tr. 158, 164.) The EEOC's Exhibits 81–89, presented by Convey as his calculations of back pay, including their mitigation setoffs, were interestingly enough, not available in Court on the first day of trial when examination of Convey commenced, and were not on the EEOC's exhibit list. (Tr. 133, 144–45, 150–52, 157.) They also were undated, and apparently were not recorded in the log of investigative activity in the EEOC investigative file of the underlying charge, even though, as Convey admitted, such file entries are dated and logged during the normal course of an investigation. (Tr. 159–60.) With respect to the calculations themselves, Convey admitted they were based on assumptions that waitresses were paid $2.10 per hour, plus tips, which Convey assumed to be $30 per day. These amounts were directly opposed to the unrefuted evidence that waitresses make $2.01 per hour, and to the EEOC's stipulation of $12 average daily tip amount. (Tr. 157–62, 171.) Convey simply proved to be an untrustworthy and unreliable witness.

(63) Other testimony presented by the EEOC which indicates unreliability and lack of credibility was that of Mary Moore who was called to sponsor backpay calculations. (Tr. 331–55.) For purposes of considering the reliability, and lack thereof, of the EEOC's case, the Court observes that the Exhibits 73–76 all commenced backpay accumulation from the respective dates the claimants applied, rather than when a white was hired for the same position or the approximate date which the EEOC alleged a white was hired for the same position. (Tr. 339, 352.) In calculating the backpay for cashier positions, Moore used a figure of $4.83 per hour, the average of the lowest and highest paid cashiers at Anderson's. Moore testified that she used this methodology because of the "instructions from [EEOC's] lawyers." (Tr. 348–350, 352.) As already stated, Anderson's has paid for less than a year a single cashier $6.00 per hour, a cashier who has worked at the restaurant for 15 years and is responsible for many more duties than just those associated with being a cashier. (Tr. 420–21.) The actual starting pay for cashiers was shown to be $3.65 per hour, which was subject to increase over time if the cashier's performance and personality warranted it. Such broad assumptions to grab as much as possible regardless of the facts casts a shadow over witness credibility, and where the witness acted at the direction of the lawyers responsible for prosecuting the claims, suspicion is aroused toward the entire presentation of their case. Moore could not explain why her calculations were different from the EEOC's corresponding backpay proposals in its Proposed Conciliation Agreement, EEOC Exhibit 15. (Tr. 344.) Moore also claimed that she used the affidavits of claimants given to the EEOC in 1984 for the dates of commencing backpay, but at least two sets of those dates did not correspond. (Tr. 340–41, 352–53.)

### EEO POSTER REQUIREMENTS

(64) Anderson's admitted that it did not have equal employment opportunity posters displayed in July of 1984 during Convey's investigation. Gary Anderson testified that the poster had been torn up prior to the on-site investigation at the direction of the health inspector because it had become soiled. Gary Anderson asked Convey to send another poster, which he had laminated and put back up where it remains. (Tr. 97, 432–33, 526–27.)

### CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. §§ 1331, 1343, and Title VII of the Civil Rights Act of 1964, § 706(f), as amended, 42 U.S.C. § 2000e–5(f)(3).

(2) Anderson's is subject to the jurisdiction of this Court and is an "employer" as defined by 42 U.S.C. § 2000e(b).

■ (3) Title VII, 42 U.S.C. § 2000e–2(a)(1) makes it an unlawful discriminatory practice for an employer to fail to hire an individual because of such individual's race. The law does not state that a person may be refused employment if he or she is black; under the law, the EEOC must prove by a preponderance of the evidence that those claimants for whom it seeks relief were not hired because they were black. *See e.g., Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

(4) In this disparate treatment case, the EEOC seeks to prove discrimination using three distinct but complementary approaches: proof of a pattern or practice of disparate treatment by direct evidence, *Mt. Healthy School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *Cline v. Roadway Express, Inc.,* 689 F.2d 481 (4th Cir.1982), *Evans v. Harnett County Board of Education,* 684 F.2d 304 (4th Cir.1982); proof of discrimination by evidence, including statistics, of a pattern or practice of disparate treatment of blacks in hiring, *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *EEOC v. Am. Nat. Bank,* 652 F.2d 1176 (4th Cir.1981), *Barnett v. W.T. Grant Co.,* 518 F.2d 543 (4th Cir.1975); and, proof of individual disparate treatment because of race under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Burdine, supra,* and *Furnco, supra.*

(5) During the trial of this case, Anderson's moved for a directed verdict at the close of the EEOC's case; but the Court was not persuaded to dismiss the action for lack of a prima facie case, but instead, reserved judgment on Anderson's Motion and allowed the case to proceed with Anderson's offering evidence. The United States Supreme Court stated in *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983), that

> The prima facie case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra,* [438 U.S.] at 577 [98 S.Ct. at 2949]. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* [450 U.S.] at 253 [101 S.Ct. at 1093].

With this principle in mind, the Court first turns to the EEOC's contention that there is sufficient direct evidence to prove a pattern or practice of disparate treatment on account of race.

### DIRECT EVIDENCE

■ (6) Where there is sufficient direct evidence of a policy of discrimination against black applicants as waitresses or cashiers, the defendant must show by a preponderance of the evidence that the same decisions would have been reached absent the presence of the discriminatory animus. *Mt. Healthy School District v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576; *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). The direct evidence of an intentional practice to discriminate against black waitress or cashier applicants consisted, in part, of Hood's testimony that three of the 138 applications he reviewed included the racial notations, "black," "black," and "nice black girl," and of Georgia Helms' testimony that when she first started working for Anderson's in

1981 she saw a white cashier make a racial notation on an application. Further, Barbara Price testified that Helms tore up an application of a black person, an assertion that Helms flatly denied. In judging the credibility and reliability of this evidence, the Court does not believe that it, standing alone, constitutes a preponderance showing that, more likely than not, Anderson's engaged in a pattern or practice of discrimination. The Court is not persuaded by Hood's testimony because it is replete with incredible and unreliable accounts of his investigative findings. Hood claimed that at least the application with "nice black girl" on it was for a waitress position; he changed his version concerning these notations on the 138 applications he reviewed from "some" to "three," which, in itself, hardly amounts to a pattern, practice or a standard operating procedure. Helms' testimony bolsters Hood's, but still falls short to prove a discriminatory practice or pattern of disparate treatment. No conclusive or credible evidence was presented of what position these applications sought, or of who the actual applicants were. Further, the Court does not believe Price's claim that Helms destroyed a black applicant's application when Helms credibly testified to the contrary. This evidence, by itself, is insufficient and does not persuade the Court that any discriminatory intent existed as a pattern or practice. Even if the Court concluded credible and sufficient direct evidence of discrimination was presented, for reasons discussed later in this opinion, it would deem that Anderson's showed that the same decisions would have been made with respect to each and every claimant in this lawsuit absent any discriminatory animus.

## STATISTICAL SHOWING

■ (7) Turning to the EEOC's second approach for pursuing this alleged pattern or practice of disparate treatment, it is incumbent upon the EEOC to show by a preponderance of the evidence that the alleged discriminatory practice of failing to hire blacks into waitress and cashier positions is Anderson's regular or standard operating procedure. *Hazelwood, supra;*

*Teamsters, supra.* Proof of isolated discriminatory acts is insufficient to give rise to establish a presumption of a pattern or practice. *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *Page v. U.S. Industries, Inc.,* 726 F.2d 1038 (5th Cir.1984). A plaintiff may establish a prima facie case of a pattern or practice of disparate treatment by statistics alone if the statistics show a gross disparity in the treatment of applicants based on race, *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856; *Hazelwood,* 433 U.S. at 307–08, 97 S.Ct. at 2741; *Barnett,* at 549; *Page,* at 1046, or by a cumulation of evidence including statistics, specific instances, patterns, or circumstantial evidence. *Barnett,* at 549; *Teamsters,* 431 U.S. at 339–40, 97 S.Ct. at 1856, (statistic combined with other evidence probative because statistics shown analytically deficient, no statistical significance, or otherwise inadequate); *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 817, 819 (5th Cir.), *reh'g denied,* 683 F.2d 417, *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982) (specific instances of discrimination against class members buttress class claim). In assessing Plaintiff's evidence, the trial court should consider factors of Plaintiff's sources, the geographical scope, proper time frame, and credibility and reliability of data. If Plaintiff produces sufficient statistical proof to give rise to a presumption of discrimination, the employer may rebut it by demonstrating that the statistics are inaccurate or insignificant or by providing a nondiscriminatory explanation. *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867; *Hazelwood,* 433 U.S. at 309, 97 S.Ct. at 2742; *EEOC v. Am. Nat. Bank,* at 1188; *Payne,* at 817. If the employer cannot dispel the inference of a pattern or practice, then each class member is not required to prove the employer's discriminatory intent again, for the court will infer all class members were victims, *Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868, unless the employer overcomes the inference unlawful discrimination against each class member. *McKenzie v. Sawyer,* 684 F.2d 62, 75–78 (D.C.Cir.1982); *Taylor*

*v. Teletype Corp.*, 550 F.Supp. 781, 785–87 (E.D.Ark.1982).

(8) The EEOC's statistical showing consists of naked data reflecting the number of waitresses and cashiers which Anderson's admits it hired during the relevant time period, the statistical composition of Anderson's workforce in July 1983, the relevant labor pool of black waitresses in the Charlotte area, and Hood and Convey's incomplete and questionable claims of the number and race of applicants.

(9) The following summaries show the number of waitresses hired for the years 1979 through September 1983, and the number of applications from 1982 through October 1983:

(a)

Waitresses Hired

| Years | White | Black |
|---|---|---|
| 1979 | 44 | 0 |
| 1980 | 6 | 0 |
| 1981 | 16 | 0 |
| 1982 | 7 | 0 |
| 1/83–9/83 | 13 | 1 |

Waitress Applications

| Years | Total | White | Black | Undetermined |
|---|---|---|---|---|
| 1/82–10/24/83 | 29 | 7 | 9 | 13 |

(b)

Cashiers Hired

| Years | White | Black |
|---|---|---|
| 2/82–12/83 | 8 | 0 |

Cashier Applications

| Years | Total | White | Black | Undetermined |
|---|---|---|---|---|
| 1/82–10/24/83 | 48 | 15 | 10 | 23 |

(10) The EEOC's conclusion of the number of waitresses hired from 1979 through 1981 is based on its Exhibit 71, Anderson's payroll records, which consists of thousands of pages, but has not been disputed. The number of hirees during 1982 and 1983 are based on Anderson's admissions. The number of applications during 1982 and 1983 is based on Hood and Convey's findings; these figures are troublesome, not only because of the questions of Hood and Convey's credibility and reliability, but also because the figures go no further back than 1982 and because the large number of

applicants in both categories whose race was undetermined; further, there was absolutely no showing that white applicants during this period were treated any differently in the selection process than blacks, particularly in regard to interviewing. Nor could Convey or Hood refer to a single specific applicant, black or otherwise, who applied before May, 1983. Thus, the Court is left to presume that blacks did apply for waitress and cashier positions from 1979 through 1982 although there is no evidence to support that contention other than the testimony that unnamed and unknown blacks applied for these positions through May 1983. Anderson's, nevertheless, conceded it hired no blacks as waitresses from 1979 through April 29, 1983 and never hired a black as cashier prior to 1984. The Court took judicial notice that blacks supply 20 percent of the general labor force, and based on EEOC's Exhibit 90, black female waitresses contribute approximately 12.9 percent of the total waitress labor force in Charlotte.

(11) In addition to these statistics, the EEOC presented more evidence of a pattern and practice of disparate treatment, including a segregated pattern of hiring blacks into positions of cooks and bus help as indicated by the following summary:

Employees Hired

| Time Period | Total | White | Black |
|---|---|---|---|
| 2/82–4/83 | 46 | 14, all waitresses or cashiers. | 32, all cooks or bus help. |

Further, the statistical workforce of Anderson's on July 6, 1983 indicates a segregated workforce:

Employees

| Position | White | Black |
|---|---|---|
| waitress | 12 | 0 |
| cashier | 7 | 0 |
| cook | 0 | 14 |
| bus help | 1 | 9 |

(12) Other evidence supportive of the EEOC's position consists of the three applications which had racial notations written across the front of them, and the testimony of Helms that she saw a cashier make a racial notation on an application in 1981.

(13) The specific instances of discrimination asserted by the claimants is not supportive of the EEOC's claim of pattern or practice of disparate treatment for reasons which will be discussed later in this opinion.

(14) The combination of the statistical comparisons with the evidence of segregated job classifications and the racial notations made on applications all support the EEOC's contention that it is fair to infer that the lack of black hirees into the position of cashier and waitress was not likely the result of chance.

(15) Anderson's did not offer any evidence demonstrating that the figures offered by the EEOC were inaccurate; to the contrary, Anderson's itself furnished the information from which these summaries were gathered. Anderson's showed, however, that a black waitress was hired in 1976, and that other black waitresses have been hired since 1983. Anderson's also showed that it has employed whites into the positions of cooks and bus help, that blacks had constant contact with customers, and that blacks were treated no differently in compensation. Although this evidence persuasively rebuts the EEOC's contention of "perfect" job segregation and "zero" hire of blacks into the position of cashier or waitress, it does not explain what appears to be a clear pattern of overall segregation by race of job assignments, and of a pattern and practice of disparate treatment. Anderson's also offered the testimony of Gary Anderson that he knew of no blacks that applied for waitress or cashier positions from 1979 until shortly after the Edna Harrison charge of discrimination was filed. It belies logic to conclude that no blacks whatsoever applied for waitress or cashier positions for nearly a four-year period. The short of the matter is, by Anderson's own admission, no blacks were hired as waitresses from 1979 through April 29, 1983, and no blacks were hired as cashiers ever until 1984, in contrast to the many whites who were hired into these positions during the same time period. Every black whom Anderson's hired during this period was hired into the position of cook or bus help and Anderson's hired no whites into those positions in this same period. This, combined with the evidence of racial notations on applications leads the Court to conclude that Anderson's engaged in a pattern and practice of disparate treatment against blacks in failing to hire them into positions of waitress and cashier. As a technical matter, all of the claimants are presumed victims of that discriminatory disparate treatment, but as the Court will discuss below, Anderson's has successfully dispelled this presumption with respect to each and every claimant.

## INDIVIDUAL CLAIMS

(16) In the individual disparate treatment claims the order and allocation of proof as set forth in *McDonnell Douglas* and *Burdine* require that the claimant establish a prima facie case of discrimination, then the employer must come forward with a legitimate, nondiscriminatory reason for its action, and the claimant must then prove that the employer's articulated reason is in fact pretextual; but the ultimate burden of persuasion always rests on the claimant. *See, Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Furnco*, 438 U.S. at 576, 98 S.Ct. at 2949; *Teamsters*, 431 U.S. at 358, 97 S.Ct. at 1866. The trier of fact may rely on inference rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence, whether direct, circumstantial, or otherwise. *Burdine, supra; Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

(17) Under the proof scheme set forth in *McDonnell Douglas*, a prima facie case can be established by showing:

(1) the claimant belongs to a protected class;

(2) the claimant was qualified and applied for an available job;

(3) though qualified, the claimant was rejected; and

(4) the employer continued to seek applicants with the claimant's qualifications.

Put another way, the EEOC may establish a prima facie case of discrimination by showing

actions taken by an employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on discriminatory criterion under the Act."

*Furnco*, 438 U.S. at 576, 98 S.Ct. at 2949, (quoting *Teamsters*, 431 U.S. at 358, 97 S.Ct. at 1866).

(18) The ritualistic application of *McDonnell Douglas* is generally avoided. *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee, supra.* The Fourth Circuit has consistently held that the claimant's burden is to establish that he or she applied for an available position, for which he or she was better qualified than the successful candidate. *Anderson v. City of Bessemer City*, 717 F.2d 149, 153 (4th Cir.1983), *reversed on other grounds*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Cuthbertson v. Bigger Brothers, Inc.*, 702 F.2d 454, 465 (4th Cir.1983); *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 672 (4th Cir.1983); *see also Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

(19) If the EEOC succeeds in proving a prima facie case of discrimination on behalf of these claimants, the burden of production shifts to the employer to articulate in a reasonably specific manner a legitimate nondiscriminatory reason for the challenged action. *Burdine*, at 253, 101 S.Ct. at 1093. This burden is merely a burden of production of evidence and the burden of persuasion does not shift to Anderson's, as that burden always rests with the EEOC. *Id.* at 256–57, 101 S.Ct. at 1095. Anderson's evidence need only be legally admissible and not intrinsically unworthy of acceptance, and the reason advanced a legitimate one. *Monroe v. Burlington Industries*, 784 F.2d 568, 571–72, (4th Cir.1986); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982).

(20) Should Anderson's carry its burden, then the EEOC must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by Anderson's were not its true reasons, but were a pretext for discrimination. To show pretext, the EEOC must show that Anderson's reasons were fabricated, that is, that a discriminatory reason more likely motivated. Anderson's or that Anderson's proffered reason is unworthy of credence. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985). The claimant's general assertion that she was not hired because of her race is insufficient as a matter of law to show that the stated reason for the decision is pretextual. *Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators*, 563 F.2d 205 (5th Cir.1977); *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir.1980). Also, the EEOC cannot rebut the stated reason of Anderson's for not hiring the claimants merely by showing that they meet the minimum qualifications for the job and believe they can perform satisfactorily. *Compare Smith v. Flax*, 618 F.2d 1062 (4th Cir.1980); *Jackson v. City of Killeen*, 654 F.2d 1181 (5th Cir.1981); *Patmon v. Van Dorn Co.*, 498 F.2d 544 (6th Cir.1974).

(21) Having determined that each of the class members were presumptive victims of a discriminatory pattern and practice of disparate treatment in failing to hire blacks into positions of cashier and waitress, the Court will discuss each individual claimant's failure to prove discrimination under *McDonnell Douglas* as well as the evidence that overcomes any inference they were discriminated against. The Court notes that, as it has already found, the testimony of these claimants and of the EEOC investigator's concerning their claims is so fraught with inconsistencies and contradictions that it can hardly be deemed reliable or credible.

(22) **JOYCE MITCHELL.** There is no credible testimony that Mitchell was qualified and applied for an available job as cashier. She repeatedly contradicted herself during trial and her deposition of when she applied; her recollection was beyond mere vague, but was so incomplete

and distorted that the Court cannot believe she pursued an interview after filling out an application. Thus, the Court does not believe that the EEOC has proved Mitchell should be treated as an applicant and thereby presumptively a victim of a pattern or practice of disparate treatment. *See Teamsters*, 431 U.S. at 364, 97 S.Ct. at 1869. Mitchell could not remember what time of day she applied, and in contradiction to all the other evidence stated that the restaurant's name was not included in the advertisement, that the application form consisted of two pages, that the restaurant was across the street from a florist and that the restaurant had bench-type seats. Anderson's has dispelled any presumption of discrimination against Mitchell in showing her total lack of reliability and credibility with respect to her even applying, and by showing that, assuming she did apply, she was not as qualified as the actual hiree or that she applied when a job opening was available, since there's no credible testimony of when she applied. The only other cashier, Skyland Pope, hired during the relevant time period had five years experience as a cashier, far greater than the experience Mitchell allegedly indicated on her application. Mitchell would not have received the cashier job had she applied when a cashier opening existed because she was not as qualified as Skyland Pope, with five years of experience. That Mitchell received no interview does not alter this conclusion; the evidence was that experience was heavily emphasized as an employment criterion and Anderson's could validly choose Pope as the most qualified without having to conduct further interviews; in any event, there is no credible testimony that Mitchell asked to arrange for an interview. Neither is there any credible evidence "to support as a reasonable probability the inference that but for ... Mitchell's race, she would not have been hired as a cashier." *See Lovelace*, at 243–44; *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365–66 (4th Cir. 1985). Anderson's introduced admissible evidence of a legitimate, nondiscriminatory reason that is "legally sufficient to justify a judgment ..." against this claimant that she was not the victim of any pattern of disparate treatment. *Burdine*, 450 U.S. at 254–57, 101 S.Ct. at 1094–96; *Teamsters*, 431 U.S. at 362, 97 S.Ct. at 1868. Mitchell was not interviewed because no one was available to interview her and there is no credible evidence that the claimant asked for an interview at a later time, and she was not hired or asked to come in for an interview in the exercise of the reasonable business judgment that a more qualified applicant was available for the position. Further, the EEOC's proof is insufficient that Anderson's action was a mere pretext for discrimination.

■ (23) **RENEE JEFFRIES.** The Court heard three different versions of what position Jeffries applied for: first, she testified at trial she applied for a cashier or waitress position; second, Hood testified she applied for a waitress job; third, Hood testified she applied to be either a waitress or busperson. This is but another of the numerous examples of the frustrating inconsistencies in the EEOC's attempted proof, which also is damaging to the credibility and reliability of the witnesses. Jeffries admitted she had no experience relevant to any of these positions. There evidence that Anderson's sought or hired any cashiers when Jeffries claimed to have applied in June, 1983. When Anderson's did hire a cashier in July, it validly chose one, Skyland Pope, with prior experience, thus dispelling any inference that Jeffries was the victim of any pattern of disparate treatment. Jeffries received an interview which took only a brief amount of time because her application stated she had no relevant work experience. The EEOC offered no evidence sufficient to prove Anderson's reason for treating Jeffries as it did was merely pretextual for its pattern of disparate treatment.

■ (24) **PENELOPE PENDERGRASS.** Pendergrass did not show up for trial, and thus offered no testimony for the Court to consider one way or another. She allegedly applied for a cashier position, although at her deposition she could not remember. Also, during her deposition she could only remember that she applied

sometime in 1983. She also stated at her deposition that when she applied she was expressly told no positions were available and that she never again tried to contact Anderson's for further inquiry or an interview. The EEOC's contention based on Hood's generally unreliable testimony that she applied for a cashier position on July 27, 1983 with one-and-one-half years experience is not worthy of acceptance without more corroboration. In any event, Anderson's reason for hiring Pope as a cashier dispels any inference of discrimination against Pendergrass since Pope had far more experience than Pendergrass' alleged one-and-one-half years. Further, the employees hired by Anderson's were hired on a full-time basis; the EEOC's own Exhibit 75 indicates Pendergrass applied for a part-time position and she testified that if she would have taken a position, she would have gone back to school the next semester. That Pendergrass applied for a part-time position, thus disqualifying her employment, explains why she was not interviewed, not hired, and not a victim of disparate treatment on account of race. The EEOC offered no proof sufficient to persuade the Court that Anderson's reasons for not hiring Pendergrass, or even interviewing her (assuming she even sought an interview), were a mere pretext.

■ (25) **CYNTHIA LINCOLN.** Lincoln allegedly applied for a cashier position on July 29, 1983 with a total of five to six months experience as cashier, which she admitted to on cross-examination as different from the one year's experience she allegedly put on her application. Further, her brief experience as a cashier ended early in 1978, over five years before she applied with Anderson's. As already stated, Anderson's decision to hire Skyland Pope, the only cashier hired in the relevant time period and plainly a far more experienced applicant than Lincoln, dispels any inference that she was a victim of disparate treatment. Anderson's never hired a cashier without prior experience and looked for applicants with prior experience that was recent. The EEOC failed to show by a preponderance of the evidence that Anderson's reason not to hire or even inter-

view Lincoln because it had already chose in the exercise of legitimate business judgment a more experienced available applicant was merely pretextual.

■ (26) **JANICE CLYBURN.** Clyburn testified after having her recollection refreshed that she applied in August, 1983, for either a cashier or cook position, but she could not remember whether she applied for part or full-time. Further, Convey testified she told him that she was not interested in working at Anderson's. Her recollection was totally unreliable, as the Court observed at trial that she did not "remember much of anything." She admitted at trial that she lied during her deposition and that she had been fired by at least one prior employer for excessive tardiness, although she did not remember whether she had indicated this on her application. There is not sufficient proof that Clyburn applied for a full-time position, thus rendering her disqualified from employment pursuant to a valid, non-discriminatory business reason; Anderson's only cashier hiree during the relevant time period, Skyland Pope, had five years experience and was available to work full-time. Anderson's certainly would have no reason to interview an applicant for a part-time position. But even if Clyburn was willing to work full-time, Anderson's articulated a legitimate reason for not hiring her because it did not hire applicants, regardless of race, whom had been fired from a prior employer for excessive tardiness. Even if Anderson's had not dispelled the inference that Clyburn was a victim of a pattern and practice of disparate treatment, which it has, she would nevertheless be entitled to recover nothing in light of the court's holding in *Smallwood v. United Air Lines, Inc.*, 728 F.2d 614, 624 (4th Cir.1984), that disqualification for employment may be established by evidence which had not been developed at the time the claimant sought and was denied employment provided such evidence is produced during trial in determining relief. The EEOC offered no sufficient proof that Anderson's reasons for not hiring or interviewing Clyburn were pretextual.

■ **(27) DIANE HILL SANDERS.** Sanders had some difficulty remembering when she applied as a waitress, but finally testified it was September, 1983. She did not list on her application any of the seven years waitress experience she had, but listed only the places where she had worked, and at that, omitted her four years prior employment as a waitress at the Charlotte City Club because she did not want Anderson's to know she had been fired for fighting. Anderson's dispelled any inference of discrimination against Sanders by offering evidence of its legitimate, non-discriminatory policy against hiring any applicant who had been fired for fighting by a prior employer. Further, Sanders testified she was working part-time when she applied at Anderson's, and without any evidence to the contrary, the Court has every reason to assume she was applying part-time at Anderson's. Thus, she was disqualified from employment due to her unavailability to work sufficient hours, which was a legitimate, non-discriminatory reason articulated by Anderson's for not hiring Sanders. Further, Sanders testified she applied at Anderson's to make more money than what she was making, but Anderson's showed that it paid no higher compensation to its waitresses than that of Sanders' then current employer. The Court concludes that Anderson's has met its burden of production under *Burdine, McDonnell Douglas*, and *Teamsters*, thus dispelling any inference of discrimination against Sanders, that the EEOC has not persuaded the Court that Anderson's articulated reasons were merely pretextual, and that even if Anderson's had not dispelled the inference, which it has, Sanders would be entitled to no relief under *Smallwood*.

■ **(28) REGINA LINSAY.** The EEOC neither called Linsay as a witness nor did it seek to offer into evidence her deposition testimony. She allegedly applied on September 24 or 27, 1983 as a waitress. She had five years experience when she applied. Linsay was specifically told by James Anderson that no opening existed when she applied, a valid non-discriminatory reason why an employer would refuse to interview or hire an applicant. Linsay had informed the EEOC that she had been employed as a waitress at Anderson's in 1976. Because Anderson's hired a waitress or waitresses prior to Linsay's applying, any inference that Linsay was discriminated against was dispelled and no evidence of the EEOC proves Anderson's reasons for not hiring an employee it does not need to be merely pretextual. On the whole, evidence with respect to Linsay's claim was severely scanty, unreliable and insufficient.

### EEOC POSTER REQUIREMENTS

■ **(29)** 29 C.F.R. § 1601.30 requires that every employer "shall post and keep posted in conspicuous places upon its premises ..." an equal employment opportunity poster. Section 1601.30(c) provides for a maximum $100.00 fine for failure to comply with this provision. Gary Anderson testified that the poster was taken down pursuant to the directions of a health inspector because it had become soiled. He offered no explanation, however, why another poster was not within a reasonable time put back up. The Court concludes Anderson's violated the Commission's requirement to keep equal opportunity posters up, but under these circumstances a fine of $1.00 is sufficient.

### RELIEF

■ **(30)** Although the evidence showed that Anderson's has hired several blacks as waitresses and at least one as cashier since May, 1983, there was no evidence that it advertises as an equal opportunity employer or that it has implemented formal guidelines and objectives for hiring blacks into the positions of cashier and waitress. While the Court believes that the EEOC has achieved its essential purpose to bring about change, it also believes that Anderson's could improve its efforts to remedy discrimination of prior years. To ensure that Anderson's removes all vestiges of a pattern or practice of disparate treatment in failing to hire blacks into the positions of waitress and cashier the Court shall enjoin the continuation of such practices as well as ordering Anderson's to implement new formal policies to assure equal opportunity.

(31) Anderson's dispelled any inference that each and every claimant named herein was the victim of a pattern or practice of discriminatory disparate treatment in the hiring of waitresses and cashiers. The claimants, therefore, are entitled to recover nothing.

(32) Any finding of fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

(33) A Judgment granting relief in part and denying relief in part will be filed simultaneously with this Memorandum of Decision.

### JUDGMENT

THIS ACTION came on for trial before the undersigned without a jury at Charlotte, North Carolina on May 11, 1987 and the issues having been duly tried, and a Memorandum of Decision having been filed simultaneously herewith;

IT IS ORDERED, ADJUDGED, AND DECREED:

(1) that Defendant Anderson's Restaurant of Charlotte, Inc., ("Anderson's") its officers, successors, assigns and all persons in active concert or participation with it, be permanently enjoined from engaging in any employment practice which discriminates because of race;

(2) that Anderson's institute and carry out policies, practices and programs which provide equal employment opportunities for black applicants for employment as waitress or cashier;

(3) that Anderson's pay a ONE and NO/100 ($1.00) DOLLAR fine for its failure to keep posted equal opportunity notices; and

(4) that the seven claimants have and recover nothing and that the EEOC's claims on behalf of each claimant be DISMISSED WITH PREJUDICE.